U.S. v. Sheehan

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

————

August Term, 2015

(Submitted: April 21, 2016  Decided: September 23, 2016)

Docket No. 15-1028-cr

————

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

DANIEL PATRICK SHEEHAN

*Defendant-Appellant*.

————

B e f o r e:

WINTER, WESLEY, and LYNCH, *Circuit Judges*.

————

Defendant Daniel Patrick Sheehan appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge*) following a jury trial for extortion, in violation of 18 U.S.C. § 1951, and use of a destructive device to commit extortion in violation of 18 U.S.C. § 924(c)(1)(B)(ii). The conviction stems from Sheehan's plot to extort money from Home Depot by placing a device purporting to be an inert "model"

of a pipe bomb in the Huntington Station Home Depot and threatening to plant bombs in other Home Depot stores. Sheehan, who conceded his guilt with respect to the extortion count at trial, challenges on appeal only his conviction for use of a destructive device. He argues (1) that the evidence was insufficient to show that the device planted in the Home Depot was, in fact, an explosive bomb; (2) that the jury was improperly instructed that it could convict on the theory that the device constituted a "combination of parts . . . designed . . . for use in converting any device into an explosive bomb and from which an explosive bomb may be readily assembled"; and (3) that the prosecutor made improper remarks during closing argument.

We conclude that the evidence was sufficient to establish that the device planted in the Home Depot was an explosive bomb, that the jury instructions on the alternative theory of guilt were not prejudicially erroneous, and that the prosecutor's summation does not entitle Sheehan to a new trial.

AFFIRMED.

———

> Jonathan I. Edelstein, Edelstein & Grossman, New York, New York, *for Defendant-Appellant* Daniel Patrick Sheehan.
>
> Jo Ann M. Navickas and Lara Treinis Gatz, Assistant United States Attorneys (of counsel), for Robert L. Capers, United States Attorney for the Eastern District of New York, Brooklyn, New York.

———

GERARD E. LYNCH, *Circuit Judge*:

Daniel Patrick Sheehan appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Denis R. Hurley, *Judge*) after a jury found him guilty of extortion in violation of 18 U.S.C.

§ 1951, and use of a destructive device to commit extortion in violation of 18 U.S.C. § 924(c)(1)(B)(ii). The conviction arises from Sheehan's plot to extort money from Home Depot by placing a device purporting to be an inert "model" of a pipe bomb in a Home Depot store in Huntington Station, New York, and threatening to plant bombs in other Home Depot locations .

Sheehan conceded his guilt on the extortion count at trial; on appeal, he challenges only his conviction for use of a destructive device. The district court instructed the jury that it could find Sheehan guilty if the device used by Sheehan during his crime was "an explosive bomb" or "any combination of parts . . . designed . . . for use in converting any device into an explosive bomb and from which an explosive bomb may be readily assembled." A. 176. Sheehan argues that the evidence was insufficient to establish that the device was an explosive bomb and that the jury should not have been given a combination-of-parts instruction. He also argues that the district court's combination-of-parts jury instruction was erroneous because it did not require subjective intent, failed to define the term "readily assembled," and was misleading. Finally, he contends that he was denied a fair trial because of improper statements made by the prosecutor during summation.

3

We conclude that the evidence was sufficient to establish that the device used by Sheehan was an "explosive bomb," as contemplated by 18 U.S.C. § 921(a)(4), and that the district court did not err in instructing the jury on the combination-of-parts theory of guilt. We further conclude that the prosecutor's comments during summation did not deprive Sheehan of a fair trial. Accordingly, we affirm the judgment of conviction.

## BACKGROUND

On March 20, 2013, a federal grand jury in the Eastern District of New York returned a three-count indictment charging Sheehan with Hobbs Act extortion, 18 U.S.C. § 1951, use of a destructive device to commit extortion, 18 U.S.C. § 924(c)(1)(B)(ii), and use of an explosive to commit extortion, 18 U.S.C. § 844(h)(1). The charges stemmed from Sheehan's attempt to obtain money from Home Depot by threatening to plant pipe bombs in Home Depot stores and placing a device purporting to be an inert "model" of a pipe bomb in a Home Depot in Huntington Station. At trial, only the first two charges were submitted to the jury. Sheehan conceded that he was guilty of extortion, but contended that the "pipe bomb" he left in the Home Depot was not functional and thus was not a "destructive device" as defined by the statute. The jury convicted Sheehan on both counts.

4

## I.    The Extortion Plot

Because the jury found Sheehan guilty of all charges relevant to this

appeal, "we view the evidence in the light most favorable to the government."

*United States v. Mergen*, 764 F.3d 199, 202 (2d Cir. 2014) (internal quotation marks

omitted). So viewed, the evidence established the following facts.

At some point prior to October 2012, Sheehan purchased a prepaid cell

phone and the components necessary to create a pipe bomb. Using a pipe, end

caps, powder from shotguns shells, and an igniter from a model rocket, Sheehan

assembled and detonated a pipe bomb in a shed.[1] The explosion left a hole in the

floor. Thereafter, Sheehan assembled a similar device using powder from

shotgun shells, a metal pipe and end caps, a nine-volt battery, a pull string and

switch, and (per his subsequent confession) another model rocket igniter, and

placed it in a cardboard light fixture box previously purchased from a Home

---

[1] The government did not argue at trial, and does not argue here, that Sheehan's actions in building and testing this unquestionably explosive device constituted the possession of an explosive bomb in furtherance of his extortion plot. We therefore do not consider whether those actions themselves violated 18 U.S.C. § 924(c)(2)(B)(ii).

Depot.[2] Several days later, while wearing a disguise consisting of a wig, arm sling

and make-up, he placed the cardboard box containing the device in the lighting

department of the Huntington Station Home Depot. Sheehan, who is allergic to

cats, also planted cat hair along with the device to throw off investigators, and

further attempted to conceal his identity by changing a character on his license

plate number with a marker. Sheehan did not initially connect the pull string to

the shelf, but about a week to ten days later, Sheehan returned to the Home

Depot and, using a construction adhesive transported in a ketchup packet,

affixed the string extending from the device to the shelf "so that it would look

like it would work." G.A. 13.

In mid-October, approximately two weeks after he glued the pull string to

the shelf, Sheehan sent a handwritten letter to the Huntington Station Home

Depot.[3] The letter states, in full:

---

[2] On appeal as at trial, Sheehan contends that the device he created was not
capable of detonation in the ordinary course of handling. He further contends
that there was insufficient evidence to find that the device included an igniter,
notwithstanding his written confession that it did.

[3] The letter was accidentally delivered to another business in the same shopping
complex, which then forwarded the letter to the Suffolk County police.

To the store mgr:

There is a bomb in the light box in the lighting dept. SKU # 491-803. YOU'RE IN NO DANGER. The battery is not connected [and] igniter is separated. It cannot go off: I needed to prove I can make a device [and] get 'em in the stores undetected.

I want two million (1.5 in 100, .5 in 50) or I will shut down all your [Long Island] stores on Black Friday. I can detonate 3 devices in 3 different stores remotely via [cellular phone]. Then bomb threats will close the rest. Doing this on Thanksgiving will assure no one gets hurt, except your wallet.

I will give you until the week of Oct. 26th to notify the suits in Atlanta [and] to get the cash. If you go to the police or feds I will go to the media – then you risk scaring off way more than two million in sales, and copycat actions.

Pay me this <u>one</u> time and you have my word you will never hear from me again. I am going to a warm climate with thin brown girls and drink myself to death. I will also get a two mill[ion dollar] life insurance policy naming Home Depot beneficiary. So consider this an interest free loan.

The other devices are 2[.5]" by 6" black pipe with 1 pound of roofing nails siliconed to them each.

If you do not pay employees will be the first then customers last. Please don't let this happen.

I will call your store at noon on Oct. 17th extension 300 to see what you decide.

I will know if you go to the cops. I can see your store all day.

Pay me – end this – raise your prices 10 cents [and] break even.

G.A. 16-17.[4]

---

[4] The original handwritten letter contained misspellings and random capitalizations that have not been reproduced here. According to Sheehan's

The Home Depot was subsequently evacuated. Members of the Suffolk County bomb squad located what appeared to be an improvised explosive device ("IED") in a cardboard light fixture box on a shelf in the lighting department. The device was x-rayed. Upon visual observation of the device and the x-ray images, the device appeared to be a pipe bomb consisting of a metal pipe and two metal end caps with wires and a nine-volt battery extending from the device. The device was affixed to the shelf via a string connected to a pull switch on the device and to a red carabiner glued to the shelf. The string appeared to be part of a triggering mechanism such that, when the device was picked up by a victim, the string attached to the shelf would pull the switch attached to the device (and, presumably, detonate it). The x-rays did not, however, provide the bomb squad with an image of the interior of the pipe.

Standard procedure for disarming a pipe bomb requires the removal of an end cap to prevent pressure from building up inside the pipe. Before attempting to remove an end cap, the bomb squad moved the device to the back of the store to prevent accidental detonation in the lighting department, which contained

written confession, he wrote in block letters to disguise his handwriting and purposely misspelled words.

metal and glass. Next, the bomb squad used a robot equipped with a Percussion Actuated Nonelectric Disrupter to shoot a disintegrating projectile at the pipe bomb in order to knock off an end cap. The device exploded, however, damaging the ceiling, walls, and doors on either end of the area in which the bomb had been placed. Post-detonation testing revealed that the powder inside the pipe bomb was double-base smokeless powder.

Two days later, Andrew Salvoni, the Home Depot manager, received a phone call from Sheehan. That call was recorded. During the call, Sheehan reiterated his demand for money, but lowered the request to one million dollars. Sheehan subsequently sent a second, typed, letter addressed to Salvoni in which Sheehan apologized for the stress he was causing Salvoni and stated that his goal was "to get the money, get away . . . [,] and not hurt anyone." G.A. 28. He then wrote:

> To achieve my goal I am going to be wired up like a Christmas tree. I have 2 devices strapped to a belt and 1 to a neck chain that I will be wearing, wired together and attached to a "deadman" switch in my hand. <u>SO PLEASE</u> tell authorities not to approach me[.] I do NOT want to be the cause of a fatherless child (they always have small children). To keep from being shot from a distance I am going to deposit in one of your stores the morning of the drop a new device I designed. I attached

9

a 2" x 6" pipe w[ith] 1 lb. of roofing nails glued to outside, wired to a 6 volt battery w[ith] 2 igniters to one of your digital thermostats set for 68 degrees. I put a[n] ice pack in the box that should give me no less th[a]n 11 hours to get money, get away and buy back device. I will call you when all is clear. You have my word and my word is my bond.

. . .

**If you guys try to screw me** – You told me your company would pay. I have not lied to you or tried to hurt anyone, so if you lied or plan to trick me this whole thing will become personal. If you drop off ANYTHING besides US circulated currency I will end Black [F]riday and all following sales events until I am caught.

G.A. 28. Sheehan later called Salvoni again and expressed anger about the presence of the police.

Using telephone records, agents of the Federal Bureau of Investigation ("FBI") were able to identify the number of Sheehan's prepaid cellular phone and locate the phone, thereby enabling the agents to locate and arrest Sheehan. Upon arrest, Sheehan agreed to make a written statement. Sheehan's written confession admitted to purchasing a prepaid cellular phone and materials for making a pipe bomb, and creating and detonating a test bomb in a shed. Sheehan further admitted to creating a similar device using smokeless powder (from shotgun shells), a pipe and end caps, a nine-volt battery and a pull string switch, and a

10

model rocket igniter; planting that device in the Home Depot; and returning to the Home Depot to attach the pull string to the shelf.

Sheehan also described his escape plan:

> Earlier this year, I . . . was given a Yamaha Wave-Runner which was hollow and motorless. I got this through a contact on [Craigslist]. . . . I also purchased a cooler at a K-Mart . . . which I was going to use with the Wave-Runner as part of my plan for the money drop. I modified both the Wave-Runner and the cooler by putting holes in them. The cooler is now attached to the seat of the Wave-Runner . . . . My plan for the money drop was to put the Wave-Runner in Huntington Harbor, and to hide in the water under the Wave-Runner and have the extortion money placed into the cooler and I would retrieve it from beneath the Wave-Runner through the holes I had cut into the cooler and the Wave-Runner. I planned to use an air tank so I could stay under water and swim away with the money.

G.A. 14-15. Prior to his arrest, Sheehan had purchased a wetsuit and an air tank.

## II. The Nature of the Device

At trial, Sheehan conceded his guilt with respect to the extortion count. His sole defense was that he was not guilty of the enhanced charge of using a destructive device to commit extortion because the device he left in the Home Depot was not a "destructive device" (as it was not capable of detonation, in his view, absent extraordinary circumstances, such as being struck by a projectile), and could not be readily converted into such a device.

11

Among other witnesses, the government called Special Agent Christopher Rigopoulos, an FBI explosives and hazardous devices examiner, as an explosives expert. Rigopoulos testified that a pipe bomb is an IED, meaning that it is not commercially made, and that the typical IED will contain an explosive main charge, an electrical fuzing[5] system, a main charge container, and a concealment chamber. Rigopoulos explained that Sheehan's device included those items in the form of smokeless powder, the wires and nine-volt battery, pipe, and light fixture box. Rigopoulos clarified that "[t]he components of an electrical fuzing system are typically wires, conductors, a switch, a power source, which are generally batteries, and an initiator, or sometimes called a load." A. 92. The initiator, also described as an "ignitor," A. 96, is placed inside the pipe to ignite the explosive main charge. No ignitor was recovered from the device, possibly as a result of the

---

[5] In his PowerPoint presentation accompanying his testimony, Rigopoulos used the term "fuze," rather than "fuse." Both terms generally refer to a device that initiates an explosion after a delay. *See Fuse*, Encyclopædia Britannica (online edition), www.britannica.com/technology/fuse-ignition-device. The United States military and the North Atlantic Treaty Organization, however, have adopted the term "fuze" rather than "fuse." *Id.*; *see also* NATO Standardization Agency, NATO Glossary of Terms and Definitions 2-F-8 (2008), https://fas.org/irp/doddir/other/nato2008.pdf. In keeping with the expert's usage, we use the spelling "fuze" throughout this opinion.

explosion.[6]

Rigopoulos acknowledged that several wires did not appear to be attached to anything and that the battery was not attached to the fuzing system, which would prevent the fuzing system from functioning in its current condition. Rigopoulos opined, however, that the battery could be attached easily with tape or epoxy (rendering the device functional) within "ten minutes or less."[7] A. 145. Rigopoulos further concluded that the device as planted constituted a "pipe bomb," notwithstanding the non-functional fuzing system, because it could be detonated by means other than the fuzing system, including by heat, shock, or friction that could be generated by dropping the device or unscrewing an end cap. A. 96. Rigopoulos testified that it was dangerous to disarm a pipe bomb by unscrewing an end cap, as that could generate a spark and cause the device to detonate.

---

[6] At trial, the parties disputed the significance of the failure to recover an igniter. Sheehan argued that the evidence was insufficient to establish that an igniter was even present while the government argued that the explosion could have destroyed the igniter, and pointed to Sheehan's confession – wherein he described the device as including an igniter – as evidence that an igniter was present prior to the explosion. Given the conflicting evidence, the jury was entitled to find that an igniter was present in the device when planted.

[7] That time estimate assumed that an igniter was in the pipe, and that the only thing that would need to be done to finish the fuzing system was to connect the wires on the exterior of the pipe.

Following Rigopoulos's testimony, the government rested and the defense moved under Fed. R. Crim. P. 29 for acquittal on the use of a destructive device charge on the ground that there was no evidence that the device contained an igniter and the battery was not hooked up to the fuzing system. The court reserved decision, and ultimately denied the motion post-trial.

During the defense's case, Sheehan presented his own expert, Warren Parker, a retired Bureau of Alcohol, Tobacco, Firearms and Explosives agent. Parker testified that there was no way, based on the x-rays and recovered portions of the device, to determine whether it contained an igniter, and that, if Sheehan needed to connect an igniter, he would need to unscrew the end cap to do so. Parker further opined that the possibility of the device exploding accidentally was "[s]o remote . . . as to be not practical at all," A. 111, as smokeless powder is stable and ignites at 600 degrees, a temperature that will not be generated by unscrewing an end cap or dropping the device.[8] Parker concluded that the device was not an explosive bomb because it "was assembled

_____

[8] Parker also noted that smokeless powder "is a military explosive . . . designed to live . . . under battlefield conditions without accidentally going off," A. 112, that it is also used by hunters (who are not careful about dropping ammunition), and that a previous incident in which a police officer was killed when a pipe bomb detonated after an end cap was unscrewed involved the less-stable black powder.

14

in a manner that could not be exploded electrically or accidentally by touching some other electrical component." A. 110.

On rebuttal, the government called a second expert witness, Kirk Yeager, a forensic scientist. Yeager opined that smokeless powder could ignite at a temperature of 400 to 451 degrees, and that, if smokeless powder was in the screw threads, the friction caused by unscrewing an end cap could create sufficient heat for detonation.

In summation, defense counsel again conceded Sheehan's guilt on the extortion count, but argued that Sheehan could not be guilty of using a destructive device because the device was designed to be incomplete. The government argued repeatedly that the device was a "real bomb," *see, e.g.*, A. 158, 167, or could be readily converted into one. Sheehan did not object to any statements made during the government's summation.

III.    **Jury Instructions and Judgment**

Over Sheehan's objection, the district court instructed the jury that it could convict Sheehan of using a destructive device if it found that the device was either "an explosive pipe bomb" or "any combination of parts either designed or intended for use in converting any device into an explosive bomb and from

15

which an explosive bomb may be readily assembled." A. 176. The district court denied Sheehan's request for a jury instruction defining the term "readily assembled" to mean that he concurrently possessed all of the necessary components.

The jury convicted Sheehan on both the extortion and destructive device counts. The district court imposed a sentence of thirty years' imprisonment on the destructive device charge, to run consecutive to a one-month sentence for extortion.

## DISCUSSION

Sheehan challenges only his conviction under 18 U.S.C. § 924(c)(1)(B)(ii), which provides a thirty-year mandatory minimum sentence for use of a "destructive device" during a violent crime. In relevant part, a destructive device is defined alternatively as either an "explosive . . . bomb," *id*. § 921(a)(4)(A)(i), or "any combination of parts either designed or intended for use in converting any device into any destructive device [listed in the statute] and from which a destructive device may be readily assembled," *id.* § 921(a)(4)(C).[9] Under either

---

[9] The statute reads, in relevant part:

> (4) The term "destructive device" means—
> (A) any explosive, incendiary, or poison gas—

16

definition, a device "which is neither designed nor redesigned for use as a weapon," *id.* § 921(a)(4), does not constitute a "destructive device." Sheehan argues that there was insufficient evidence to establish that the device planted in the Home Depot was an "explosive bomb" within the meaning of § 921(a)(4)(A)(i).

Sheehan further contends that the jury should not have been instructed at all on the combination-of-parts theory of guilt because that theory is inapplicable to completed devices, and that, even if an instruction on that theory was permissible, the charge given was erroneous because it (1) did not include an instruction on subjective intent or define the term "readily assembled," and (2) misleadingly included a reference to an inapplicable portion of the statute.

---

      (i) bomb, [or]

   . . .

(C) any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) . . . and from which a destructive device may be readily assembled.

The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon . . . .

18 U.S.C. § 921(a)(4).

Finally, Sheehan argues that the prosecutor's summation deprived him of a fair trial.

## I. "Explosive Bomb"

Sheehan first contends that there was insufficient evidence to establish that his device was an "explosive bomb" within the meaning of the statute. In challenging the factual sufficiency of the government's case, defendants face a "heavy burden, as the standard of review is exceedingly deferential." *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015) (internal quotation marks omitted). We analyze the sufficiency of the evidence "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence," and will uphold the conviction "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Chavez*, 549 F.3d 119, 124 (2d Cir. 2008) (alteration, citations, and internal quotation marks omitted).

The design of the device suggested that it was intended to be "victim actuated," A. 93, meaning that when the concealed device was moved by a potential victim, the string attached to the device and the shelf would pull a

18

switch, complete a circuit, and cause the device to explode. It was undisputed at trial that the device's electrical fuzing system was not fully connected when the device was found and disarmed by the bomb squad. Therefore, the device could not have been detonated via the electrical fuzing system.

The experts at trial disagreed, however, as to whether the device could be detonated by other means, for example, by unscrewing an end cap or by dropping the device. Because we must draw all inferences in the government's favor, we must assume that the jury credited the testimony of Rigopoulos and Yeager that the device could be detonated in some manner, such as by dropping the device or by unscrewing an end cap, even though the fuzing system was disconnected.

Accordingly, the question presented is whether a jury could reasonably find that a device that is incapable of detonating in its ordinary or intended manner (because, for example, it lacks a particular component ordinarily present in such a device), but is nonetheless capable of detonating, is an "explosive bomb" within the meaning of the statute. We have little difficulty concluding that it is. Although this Court has not previously had occasion to address the question, our sister circuits that have done so have held that the touchstone of

whether a device is an "explosive bomb" is simply whether the bomb is capable

of exploding, and have affirmed convictions on the theory that a device that is

capable of exploding is an "explosive bomb" within the meaning of the statute.

*See, e.g.*, *United States v. Uzenski*, 434 F.3d 690, 702 (4th Cir. 2006) (affirming

conviction where evidence established "at the very least, that the device was

capable of exploding"); *United States v. Langan*, 263 F.3d 613, 625 (6th Cir. 2001)

("[T]he government need not establish that any particular component be present

for a device to qualify as a destructive device. The only requirement is that the

device be capable of exploding . . . .").[10] That the bomb could not explode in the

---

[10] Many cases interpreting the term "destructive device," including *Uzenski*, have done so in the context of the National Firearms Act, 26 U.S.C. § 5801 *et seq.*, which makes it a crime to receive or possess an unregistered firearm, *id.* § 5861(d), with the term "firearm" being defined to include a "destructive device,"*id.* § 5845(a). The National Firearms Act, 26 U.S.C § 5845(f), and the statue at issue here, 18 U.S.C. § 921(a)(4), define the term "destructive device" identically.

Although the term "destructive device" is defined identically in the two statutes, and thus must be given a similar construction, *United States v. Posnjak*, 457 F.2d 1110, 1114 (2d Cir. 1972), we pause to note that different policy considerations are implicated by each statutory scheme. Under the National Firearms Act, the only "act" required to incur criminal liability is the failure to register a destructive device, whereas a person can be guilty under 18 U.S.C. § 924(c) only if she uses a "destructive device" in furtherance of some other crime of violence. Thus, in *Posnjak*, we held that possession of unregistered dynamite does not violate the National Firearms Act because dynamite has a legitimate social purpose; reading the term "destructive device" expansively in that context could impose criminal liability on persons possessing certain items for perfectly

way its maker might have assumed was the ordinary or even only way in which it could be detonated – *i.e.*, via the fuzing system – because it lacked a particular component of which such a device is ordinarily composed, is irrelevant. As we have held, whether the defendant *intends* the device to detonate is irrelevant when the assembled device constitutes an "explosive bomb" within the meaning of the statute. *United States v. Posnjak*, 457 F.2d 1110, 1119 (2d Cir. 1972).

Notwithstanding the testimony of the government's expert witnesses, Sheehan argues that the device cannot be considered a completed bomb because such testimony "is so contrary to human experience that no reasonable person would believe it beyond a reasonable doubt." Appellant's Reply Br. 8. That argument, however, is essentially premised on the testimony of Sheehan's expert, which the jury was free to disregard in favor of the contrary expert testimony offered by the government. Although there may be rare circumstances where an expert's testimony is so incredible that no rational factfinder could believe it

---

legitimate purposes. *See Posnjak*, 457 F.2d at 1118. But § 924(c) requires that the device, *i.e.*, dynamite, be used or carried in furtherance of a crime of violence. In that context, the fact that dynamite also has a legitimate purpose would seem less significant. Thus, while the meaning of the definition is the same in both statutes, caution should be applied in translating broad dictum or policy concerns from National Firearms Act possession cases to extortion cases under § 924(c).

beyond a reasonable doubt, the testimony of Rigopolous and Yeager does not fall into that category. Their testimony is not so illogical or contrary to common sense that no rational jury could accept it. Drawing all inferences in favor of the government, we must conclude that the jury credited their testimony that the device could be detonated over the contrary testimony of the defense expert.

Sheehan additionally argues that, even if the "device was an explosive bomb, [his] conviction must still be reversed because, measured objectively, it was neither designed nor redesigned for use as a weapon." Appellant Br. 35. In light of the objective features of the device – which was built to look like an IED, contained an explosive, and was capable of detonating – the jury could rationally find that the device was objectively designed as a weapon even if it was missing a component required to enable it to explode in a specific way. *Cf. Langan*, 263 F.3d at 625. To the extent that the lack of a functional fuzing system may indicate that Sheehan did not *subjectively* intend for the device to be capable of detonation, or did not know such detonation was possible, Sheehan's belief is irrelevant, since, when it is clear that the assembled device constitutes an explosive bomb as defined in the statute, "intent is irrelevant." *Posnjak*, 457 F.2d at 1119.

## II. "Combination of Parts"

With respect to the alternative combination-of-parts theory of guilt, Sheehan primarily argues that the jury was improperly instructed.[11] Sheehan contends that the jury should not have been instructed on the combination-of-parts theory at all, because it is inapplicable to completed devices. Sheehan also argues that, to the extent it was appropriate to submit the charge to the jury, the jury charge was erroneous because it did not instruct the jury to acquit Sheehan if it found that he did not subjectively intend to build an explosive bomb and because it did not define the term "readily assembled." Sheehan further contends that the charge was misleading because it mistakenly included a reference to an inapplicable portion of the statute.

"We review a claim of error in jury instructions de novo, reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). In conducting that review, we examine the charge "as a whole to see if the entire charge delivered a correct

---

[11] Sheehan largely presents these arguments as challenges to the sufficiency of the evidence under the combination-of-parts theory. His arguments, however, challenge the appropriateness of the theory as presented to the jury and are thus properly framed as challenges to the jury instructions.

interpretation of the law." *United States v. Bala*, 236 F.3d 87, 94–95 (2d Cir. 2000)

(internal quotation marks omitted). "An erroneous instruction, unless harmless,

requires a new trial." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir. 1994). An error

is harmless only if it is "clear beyond a reasonable doubt that a rational jury

would have found the defendant guilty absent the error." *Neder v. United States*,

527 U.S. 1, 18 (1999).

### A.   Completed Devices

Sheehan argues on appeal, as he did at the charge conference below, that

the combination-of-parts theory is inapplicable to this case as a matter of law.

"Where a jury is presented with multiple theories of conviction, one of which is

invalid, the jury's verdict must be overturned if it is impossible to tell which

theory formed the basis for conviction." *United States v. Szur*, 289 F.3d 200, 208

(2d Cir. 2002). In such circumstances, our task is to "ascertain whether a flawed

instruction had a substantial and injurious effect or influence in determining the

jury's verdict." *United States v. Ferguson*, 676 F.3d 260, 276 (2d Cir. 2011) (internal

quotation marks omitted). A defendant is not prejudiced by an "infirm

instruction" if "the jury would have necessarily found [him] guilty on one of the

properly instructed theories of liability." *Id*. at 277.

Sheehan argues that the district court erred in instructing the jury that it could convict him if it found that the device was an explosive bomb *or* a "combination of parts . . . designed . . . for use in converting any device into an[] [explosive bomb]," 18 U.S.C. § 921(a)(4)(C), because the latter theory applies only to incomplete devices, and not to devices that are fully assembled but missing key components. That argument lacks merit.

First, the text of § 921(a)(4)(C) does not limit itself solely to disassembled devices, as it encompasses "*any* combination of parts" that can be converted into an explosive bomb. The phase "*any* combination of parts" naturally extends, at a minimum, to both fully disassembled and partially completed devices. There is no meaningful way to distinguish objectively between a "partially assembled" device to which critical additional parts have yet to be added, and an identical configuration of assembled and missing parts which is "fully assembled" in the sense that its maker believes he has completed his project. Even where a device appears to be fully assembled, but is defective in some way because not all of the parts are in place, the text of the statute is satisfied if the device has been designed (in an objective sense) in such a way that it can be easily converted into an effective explosive. *See United States v. Johnson*, 152 F.3d 618, 627 & n.8 (7th Cir.

1998) (observing that a defendant who possesses "an assembled combination of parts that is less clearly" a completed destructive device will generally be charged under the combination-of-parts theory, and noting that homemade bombs are likely to be charged under the combination-of-parts theory "because that allows the government a more flexible method of proving [its] case").

Second, even assuming *arguendo* that the combination-of-parts theory is categorically inapplicable to "fully assembled" devices, the question of whether a device was "fully assembled" is a question of fact for the jury. Thus, a combination-of-parts instruction would be appropriate as long as a rational jury could find that the device was at least partially disassembled. *See id.* at 627 (finding that the trial court had acted within its discretion in giving a combination-of-parts instruction based on the defendant's argument that the device was "not sufficiently assembled to detonate"). The jury in this case heard expert testimony that the device could have quickly and easily been rendered functional with materials readily available within a Home Depot store. A rational jury could conclude that Sheehan's device – which indisputably lacked a functional fuzing system – was a partially completed device designed in such a

26

way that with readily available materials it could have been converted into a functional explosive device.

Accordingly, the district court did not err in instructing the jury that it could convict if it found beyond a reasonable doubt that the device qualified either as a "destructive device" or as a "combination of parts" designed so that it could readily be assembled into a listed destructive deivce.

### B. Subjective Intent

Sheehan next argues that the jury instructions were erroneous because they did not include an instruction indicating that he could not be convicted of possessing a "destructive device" if he lacked the subjective intent to build such a device. The government elected to proceed solely on a theory of "objective design" and successfully moved *in limine* to preclude evidence of Sheehan's subjective intent, which, Sheehan contends, was to create a "model" or "prototype" of a pipe bomb. Def.'s Br. 27, 42. Following a post-trial motion for a new trial pursuant to Fed. R. Crim. P. 33, the district court affirmed its ruling. Upon consideration of the statutory text and relevant case law, we conclude that the district court correctly declined to give a subjective intent instruction.

The relevant portion of the statute provides that a destructive device includes "any combination of parts *either* designed or intended for use in converting any device into [an explosive bomb] and from which [an explosive bomb] may be readily assembled," and further exempts from its coverage any "device which is neither *designed* nor redesigned for use as a weapon . . . ." 18 U.S.C. § 921(a)(4)(C) (emphasis added). The text of the statute, which lists "designed" and "intended" in the alternative, thus indicates that the word "designed" in this context means something other than "intended."

In *United States v. Posnjak*, we parsed the distinction between "intent" and "design" in considering whether commercial dynamite qualified as a destructive device.[12] Concluding that it did not, we explained that "[t]he legislative history indicates that 'designed' in [the context of the phrase 'designed or redesigned for use as a weapon'] refers to objective, physical structure or method of operation and not to [the] intent or schemes of the possessor," *Posnjak*, 457 F.2d at 1116, and further explained that the inclusion of the words "or intended" in the statute indicated that in some instances "intention to convert a device into a[] [listed

---

[12] As discussed in note 9, *supra*, *Posnjak* analyzed the definition of "destructive device" under the National Firearms Act.

28

device] will be relevant," *id.* at 1120. We then clarified that:

> When it is clear that the assembled device created by combining the components [would be a device listed in the statute], intent is irrelevant, for the parts are clearly "designed" to convert the device into a destructive device. When it is equally clear that the end product [would not be a listed device], the same is true. When, however, the components are capable of conversion into both such a device and another object not covered by the statute, intention to convert the components into the "destructive device" may be important.

*Id.* at 1119. *Posnjak* thus clarifies the only situations in which subjective intent is relevant: when the unassembled components are capable of being assembled either into an object listed in the statute as a destructive device (such as an explosive bomb) or into an object that is not otherwise covered by the statute.[13]

---

[13] That conclusion is very similar, though not identical, to the approach taken by several of our sister circuits that have held that subjective intent is relevant only when the device could have legitimate commercial or social value. *See, e.g., United States v. Tomkins*, 782 F.3d 338, 345-46 (7th Cir. 2015); *United States v. Urban*, 140 F.3d 229, 234 (3d Cir. 1998). But we also note that other circuit courts appear to have reached the conclusion that any conviction under the combination-of-parts theory requires subjective intent. *See Uzenski*, 434 F.3d at 701 n.4 (collecting cases). Because the plain language of the statute contemplates the possibility that a combination of parts can qualify as a destructive device where it is objectively designed – as well as when it is subjectively intended – to be converted into an explosive bomb, we do not find those cases persuasive insofar as they may be read to require intent.

The relevance of intent is that in some instances, parts that could be used to build a listed device could also be used to construct some other type of device with a legitimate purpose. Because the National Firearms Act (which defines the term "destructive device" identically as 18 U.S.C. § 921(a)(4), *see* 26 U.S.C § 5845(f)) criminalizes mere possession of an unregistered destructive device, absent some requirement of subjective intent, a person could be convicted under federal law of the unauthorized possession of a destructive device simply because she possessed, for legitimate reasons, a variety of ordinary items that could be used either to build bombs or to build something quite innocent. Intent to convert those items into a destructive device is thus necessary to prevent persons from being subject to criminal penalties for harmless, legitimate acts. That policy concern is not implicated, however, where the assembled device lacks any legitimate purpose.

There is no evidence in this record that would permit an inference that the combination of parts assembled by Sheehan could have been made into any kind of product or device *other* than a bomb, even assuming that it was not already an explosive bomb capable of detonating. Here, Sheehan's argument that the parts in question could be assembled into something other than a bomb rests on the

proposition that the device he planted at the Huntington Home Depot could be converted into either a functioning pipe bomb or an inert "model" of a pipe bomb; thus, by Sheehan's reasoning, a subjective intent instruction is required because an inert "model" is not a listed device. But this theory falls of its own weight.

First, the combination of materials installed in the lighting department, again assuming it was not yet a functional bomb, already *was* an inert "model," and Sheehan has not even hypothesized, let alone offered any evidence at trial, that the parts could have been made into anything of a legitimate nature, or indeed, into anything other than a bomb or model of a bomb. Therefore, policy concerns about criminalizing possession of legitimate items are not implicated because Sheehan's device was indisputably illegitimate. Second, any combination of parts capable of being assembled into a functional bomb could *always* be assembled in such a way as to render the device non-functional. If a bomb-maker could argue that the parts he had assembled were theoretically capable of being assembled into either a functional or a non-functional bomb, simply because the parts could either be connected properly or left, in some respect, unconnected, then a subjective intent instruction would be required in essentially *every*

31

combination of parts case, thereby rendering the objective "designed" alternative in 18 U.S.C. § 921(a)(4) superfluous. That conclusion is at odds with both *Posnjak* and with ordinary canons of statutory construction. *See State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir. 2003) ("It is well-settled that courts should avoid statutory interpretations that render provisions superfluous . . . ."). We therefore hold that where a device is capable of being assembled only into a listed device, or a non-functioning version of that same device, it does not fall into the exception outlined in *Posnjak* requiring a subjective intent instruction. Rather, the government may properly proceed on an "objective design" theory.[14]

Because Sheehan's device could only be assembled into an explosive bomb, or a non-functioning version of an explosive bomb, the district court did not err in declining to give a subjective intent instruction.

---

[14] The construction of a device to resemble a bomb, but not actually detonate, is, of course, relevant to the question of whether it was "designed or redesigned for use as a weapon." 18 U.S.C. § 921(a)(4). Thus, in some instances, "the construction of a device, objectively assessed, [may] raise[] the reasonable possibility that it was designed as something other than a destructive device." *Johnson*, 152 F.3d at 627. That inquiry, however, is for the jury to answer and concerns the objective design and construction of the device – not the defendant's subjective intent.

32

## C.      "Readily Assembled"

Sheehan next argues that the district court erred in declining to define the term "readily assembled" in its instructions on the combination-of-parts theory.

A trial court's decision not to include a requested jury instruction may be overturned "only if the instruction that was sought accurately represented the law in every respect and only if viewing as a whole the charge actually given, the defendant was prejudiced." *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) (alteration and internal quotation marks omitted). Prejudice may result where a requested instruction "represents a theory of defense with basis in the record that would lead to acquittal, and the theory is not effectively presented elsewhere in the charge." *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006) (internal quotation marks omitted).

Sheehan requested, and was denied, a jury instruction stating that in order for the device to be capable of being "readily assembled," the defendant must possess all necessary components without "going shopping." A. 135. The district court instead instructed the jury that it should interpret "readily" and "assembled" "consistent with their everyday ordinary meanings." A. 176.

Turning to the question of whether the requested charge correctly stated that law, we note that *Posnjak* mentioned, in describing the combination-of-parts theory, that "[a]ll of the necessary components from which a destructive device may be readily assembled must be possessed in order to possess a destructive device." *Posnjak*, 457 F.2d at 1116 (internal quotation marks omitted). *Posnjak*, however, primarily addressed the question of whether commercial dynamite, which has a legitimate purpose independent of its destructive one, could constitute a destructive device and, apart from that single passing reference, did not analyze what components must actually be possessed. We do not think that the statement in *Posnjak* was intended to require the government to prove that the defendant possessed every single item, including ordinary household items, that would be necessary to assemble a destructive device.

In this case, based on Rigopoulos's testimony, the only item necessary to convert the device on the Home Depot shelf (if not already functional) into a fully functional bomb was a piece of adhesive tape to connect the wires to the battery. Such an ordinary household item is not only present in virtually every American household – it was also readily available within the Home Depot outlet where the device was installed. Indeed, Sheehan's own expert acknowledged that there was

34

tape around the device that could have been used to attach one of the wires from the pipe to the top of the battery. The language in *Posnjak* on which Sheehan relies makes sense when read to require that a "combination of parts" cannot be considered a destructive device based on the hypothetical possibility that the parts could be "readily" made into a bomb only if the defendant could obtain some crucial component that he did not possess and could not acquire without a "shopping trip." *See, e.g., United States v. Malone*, 546 F.2d 1182, 1184 (5th Cir. 1977) (holding that the defendant could not be convicted for possessing a combination of parts that could be readily assembled into a bomb where the defendant did not possess any explosive material, a key element required for the creation of a bomb). *Posnjak* cannot sensibly be read to require proof that the defendant already owned such a mundane and readily accessible "component" to be used in attaching the functional parts of the device to each other.

We therefore hold that the government need not offer evidence that the defendant possessed commonly available materials – such as tape – if the defendant otherwise possesses all of the key components necessary to assemble a destructive device. *See United States v. Simmons*, 83 F.3d 686, 687 (4th Cir. 1996) (observing that possession of a method of ignition, such as a match, is not

typically required to find that the defendant possessed the components necessary to assemble a Molotov cocktail); *United States v. Crocker*, 260 F. App'x 794, 797 (6th Cir. 2008) ("Although the government did not introduce evidence that the defendant possessed tape, this Court does not require showing possession of all commonly available materials when determining whether a destructive device could have been readily assembled."); *Langan*, 263 F.3d at 626 (holding that a reasonable jury could find the device to be readily convertible into an explosive bomb where wires could be quickly stripped and re-crimped to a pager that was part of the detonating mechanism).

As Sheehan could be convicted of possessing a combination of parts that may be readily assembled into an explosive bomb even absent evidence that he possessed tape, the district court did not err in declining to give the requested instruction.

### D.    Mistaken Inclusion of "Or Intended" Language

Sheehan further argues that the jury charge was misleading because it mistakenly included a reference to an inapplicable portion of the statute. The government proceeded solely on a theory of objective design, and the court excluded *in limine* evidence related to Sheehan's subjective intent. In instructing

36

the jury, the district court stated:

> A destructive device has several meanings under the statute. But for the purpose of this case, the only relevant meaning is an explosive bomb. And this would include, A, an explosive pipe bomb or; B, any combination of parts either designed *or intended* for use in converting any device into an explosive bomb and from which an explosive bomb may be readily assembled.

A. 176 (emphasis added). The court additionally explained that, in considering whether the device was "designed for use as a weapon," the jury's analysis "must be objective" and "focus solely on the physical structure and operational characteristics of the device in determining its purpose." A. 176-77.[15]

Sheehan did not object to the jury instruction. As the district court acknowledged, and the government concedes, it was error to include the phrase "or intended," as the evidence was limited to that concerning objective design. Sheehan contends that the inclusion of the phrase "or intended" is plain error as it would allow the jury to convict Sheehan if it found that the device was objectively

---

[15] The court later instructed the jury that "[a]n act is done intentionally when the defendant acted deliberately and purposefully. That is, defendant's acts must have been the product of defendant's conscious objective rather than the product of a mistake or accident." A. 177.

designed to be an inert prototype, but that Sheehan subjectively intended to create a destructive device.

Because Sheehan did not object to the jury instruction, we review for plain error, which requires him to establish "(1) error (2) that is plain and (3) affects substantial rights." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007). If those requirements are met, we then "consider whether to exercise our discretion to correct it, which is appropriate only if the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* (internal quotation marks omitted). The district court found that the mistaken inclusion of the words "or intended" benefitted the defendant as "it suggested, albeit erroneously, that his intent . . . might somehow be germane," A. 275, and further concluded that the error was harmless. We disagree with the conclusion that the erroneous instruction necessarily benefitted the defendant since, read literally, it would provide an alternative theory (intent to create a bomb) under which the jury could convict Sheehan. Nevertheless, we agree that on the facts of this case, the error did not affect Sheehan's substantial rights or undermine the fairness of the trial.

On the record of this case, there was no meaningful possibility that the jurors could have misunderstood the position of the parties or the theory on

which the case was put before them. In light of the evidence, the summations, and the instructions taken as a whole, it was made clear to the jury that the government's case rested on the alternative arguments that the device, based on its objective design, either *was* an explosive bomb or was a combination of parts that *could* be assembled into one, without reference to Sheehan's intentions. It was undisputed at trial that the device planted in the Home Depot was, at the very least, missing a functional electrical fuzing system and Parker testified that the device had been deliberately rendered inoperable. Sheehan additionally argued in his opening statement and summation that the device was designed to be a "model" or "prototype" of an actual pipe bomb. A. 21; A. 160. The government presented no evidence, and made no argument, that Sheehan actually intended to make further alterations to the device; it offered testimony, and argued to the jury, only that such alterations were theoretically possible. On the record, to the extent that the jury had a reasonable doubt about whether the device was objectively designed to be, or capable of ready conversion into, an explosive bomb, it could not rationally have then found that Sheehan *intended* to build an explosive bomb absent some evidence of his future plans for the device. The district court's erroneous inclusion of the statutory phrase "or intended" thus did not affect

39

Sheehan's substantial rights or adversely affect the fairness of the proceedings. *See United States v. Tomkins*, 782 F.3d 338, 347 (7th Cir. 2015) ("[A]ny error with the jury instructions' definition of 'destructive device' was harmless because there was ample evidence to prove beyond a reasonable doubt that the devices were destructive devices.").

Accordingly, we conclude that the district court appropriately instructed the jury on the combination-of-parts theory, was not required to give a subjective intent instruction or definition of the term "readily assembled," and that the jury charge, taken as a whole, was not misleading. We reject Sheehan's challenges to the combination-of-parts theory of guilt and, because the evidence was sufficient to convict him of possessing an explosive bomb, we need not address the sufficiency of the evidence with respect to the combination-of-parts theory.[16]

---

[16] "[W]hen divergent theories of criminal liability are submitted to the jury and the jury renders a general guilty verdict, on a challenge to the sufficiency of the evidence, if the evidence amply supports one of the theories presented the verdict must be affirmed." *United States v. Delano*, 55 F.3d 720, 730 (2d Cir. 1995). However, if one of the theories is based on an erroneous view of the law, remand is appropriate even if the evidence is sufficient to prove the other theory. *Id.* at 730-31. Because the evidence was sufficient to sustain Sheehan's conviction under § 921(a)(4)(A)(i), we need not address the sufficiency of the evidence with respect to the alternative combination-of-parts theory of guilt.

**III. Summation**

Sheehan also argues that the government's closing arguments, in particular, its rebuttal summation, deprived him of a fair trial, citing a number of examples of purported misconduct. "[A] defendant who seeks to overturn his conviction based on alleged prosecutorial misconduct in summation bears a heavy burden." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal quotation marks omitted). "The defendant must show not simply that a particular summation comment was improper, but that the comment, viewed against the entire argument to the jury, and in the context of the entire trial, was so severe and significant as to have substantially prejudiced him, such that the resulting conviction was a denial of due process." *United States v. Williams*, 690 F.3d 70, 74-75 (2d Cir. 2012) (internal quotation marks omitted). As Sheehan did not raise this objection at trial, we will not reverse "absent flagrant abuse." *United States v. Zichettello*, 208 F.3d 72, 103 (2d Cir. 2000) (internal quotation marks omitted).

Although we do not include a full recitation of the statements claimed to be improper, they can be broken down into roughly three categories: statements that

41

allegedly mischaracterized the evidence,[17] statements that allegedly reflected the prosecutor's personal beliefs about defense counsel,[18] and statements that allegedly denigrated the defense expert.[19] Upon careful review of the record as a whole, we find that most of the comments were permissible arguments about the merits of the defendant's theory of the case or made in response to defense counsel's own summation comments, which impugned the integrity of the government's case. *See United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) ("[T]he government is allowed to respond to an argument that impugns its integrity or the integrity of the case, and when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion." (internal

---

[17] For example, Sheehan claims that the statement, "[p]ipe bombs, if you unscrew them and there is any smokeless powder in the threading, it's going to explode," A. 157, misstated the evidence which shows only that pipe bombs *may* explode in that circumstance.

[18] These challenged statements largely emphasized the point that defense counsel was "a good lawyer" but "not a bomb tech" and "not a mind reader," A. 167, and contended that defense counsel "has a fundamental misunderstanding of the evidence," A. 168, and had presented irrelevant arguments.

[19] The challenged statements characterized Parker as a "hired gun[]" who "flipped flopped," A. 159, and compared Parker unfavorably to the members of the bomb squad who disarmed the bomb.

quotation marks omitted)). In any event, even assuming that some of the statements made by the prosecutor were improper, they certainly cannot be considered to amount to "flagrant abuse." *See Farhane*, 634 F.3d at 167 ("The law has long recognized that summations – and particularly rebuttal summations – are not detached expositions, with every word carefully constructed before the event." (alterations and internal quotation marks omitted)). As the district court observed, although some of the prosecutor's statements "were not as nuanced as the power of hindsight in a non-summation context would permit," A. 252-53, none of the statements were so egregious that, even when taken cumulatively, they could have undermined the fairness of the trial.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.