# United States Court of Appeals
## For the First Circuit

No. 18-1260

UNITED STATES,

Appellant,

v.

DANIEL E. MUSSO, SR.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Matthew T. Hunter, Special Assistant U.S. Attorney, with whom Scott W. Murray, United States Attorney, Seth R. Aframe, Assistant U.S. Attorney, and John S. Davis, Assistant U.S. Attorney, were on brief, for appellant.
Penny S. Dean for appellee.

January 25, 2019

**LYNCH**, **Circuit Judge**.  The government appeals from the district court's pretrial dismissal of four charges of violations of the National Firearms Act (NFA), 26 U.S.C. § 5801 et seq., brought against Daniel Musso.  Musso bought four military M67 fragmentation grenades from an FBI agent during an undercover sting operation.  The FBI had obtained the grenades used in the sting from the U.S. Marine Corps.  M67 grenades are issued to Marines for combat.  Before the sale to Musso, the FBI had replaced each grenade's original, operable fuze with an identical but inoperable one.  The district court agreed with Musso that, because the operable fuzes had been removed and replaced with inoperable fuzes, the grenades were not "explosive grenades" under the NFA.  United States v. Musso, No. 16-CR-033-JD, 2018 WL 1313977, at *8 (D.N.H. Mar. 9, 2018).

For purposes of the motion to dismiss, Musso admitted, among other things, that each grenade was still armed with its original explosive charge:  6.5 ounces of Composition B high explosives.  Composition B is a mixture of TNT and RDX that, when in the amount included in an M67 grenade, has a killing radius of about five meters (just over sixteen feet).  The motion further admitted that each grenade could be made to explode by reinserting a live fuze or by a "commercial/military/improvised detonator."

Based on the admitted facts and on the complete text, statutory context, and Congress's intent in enacting the

"explosive grenade" provision of the NFA, we reverse and hold that each grenade, as purchased by Musso, was an "explosive grenade."

I.

A.   <u>The National Firearms Act, 26 U.S.C. § 5801, et seq.</u>

The NFA makes it a crime to receive or possess an unregistered "firearm."  26 U.S.C. § 5861(d).  There is no dispute that the grenades here were "unregistered."  Under the NFA, the definition of the term "firearm" includes a "destructive device." Id. § 5845(a)(8).  The act later, in Section 5845(f)(1), defines a "destructive device" as

> (1) any explosive, incendiary, or poison gas
>     (A) bomb,
>     (B) grenade,
>     (C) rocket having a propellent [sic] charge of more than four ounces,
>     (D) missile having an explosive or incendiary charge of more than one-quarter ounce,
>     (E) mine, or
>     (F) similar device . . . .

Id. § 5845(f)(1).  The government relies on this definition.  We note that the NFA does not define the terms "explosive" or "grenade."

Section 5845(f) has two later sections that include other things as destructive devices:

> (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or

- 3 -

> shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and
> (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

Id. § 5845(f)(2)-(3).

Following these terms, the statute has a separate sentence that excludes "any device which is neither designed nor redesigned for use as a weapon" and "any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device." Id. Those exclusions present affirmative defenses; they do not define elements of the substantive offense. United States v. Beason, 690 F.2d 439, 445 (5th Cir. 1982).

The NFA was not the first statute to deal with devices like those at issue here. In April 1968, six months before Congress enacted the above "destructive device" provision, Congress made it a crime to, among other things, teach the "use, application, or making of any firearm or explosive or incendiary device." 18 U.S.C. § 231(a)(1). One such "explosive or incendiary device" is an "explosive . . . grenade." 18 U.S.C. § 232(5)(B). Congress again addressed these devices when it enacted a "destructive device" provision as part of the gun control provisions of the Omnibus Crime Control and Safe Streets Act of

- 4 -

1968.  See Pub. L. No. 90-351, § 921(a)(4).  Congress shortly thereafter added the same "destructive device" provision to the NFA with the Gun Control Act of 1968 (GCA).  See United States v. Oba, 448 F.2d 892, 893-94 (9th Cir. 1971).

The GCA's purpose was "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence."  Pub. L. No. 90-618, § 101.  It represented "a Congressional attempt to stem the traffic in dangerous weapons being used in an increasing number of crimes involving personal injury."  United States v. Posnjak, 457 F.2d 1110, 1113 (2d Cir. 1972).  And, in the GCA, Congress included the "destructive device" provision at issue here to cover "military-type weapons," id. at 1115 (citing S. Rep. No. 90-1501, at 25, 30 (1968)), and "objectively identifiable weapons of war," id. at 1116.

Unlike with many other crimes, Congress chose not to criminalize attempts to violate the GCA's destructive device provision.  A practical consequence of that decision is that agents engaged in undercover sting operations actually pass destructive devices like explosive grenades to the target, which runs some operational risks.  Law enforcement tries to reduce those risks to agents, targets, and the public by removing fuzes from otherwise live grenades.

B.    Background

The essential facts are undisputed for our purposes and are worth repeating.  The FBI replaced the grenades' original fuzes with mechanically and visually identical, but inoperable, fuzes before giving them to Musso.  Each grenade was, however, armed with its original explosive charge of Composition B.[1]  Each grenade could be made to explode by, for example, replacing the inoperable fuze with an operable one, by using a commercial or homemade detonator, or by a sufficient impact.  The government concedes that the grenades as purchased by Musso would not have detonated absent these other circumstances had Musso or anyone else merely pulled their pins.  A search of Musso's property following his arrest did not turn up any fuzes or other detonators.

C.    Procedural History

Musso moved to dismiss four counts of the resulting indictment, arguing that the grenades he received were not "explosive grenades" and so were not destructive devices under the NFA.  On March 9, 2018, the district court granted Musso's motion to dismiss those counts.  Musso, 2018 WL 1313977, at *8.

---

[1]    We deem Musso to have admitted this for purposes of the motion to dismiss.  We note that he has not pleaded guilty to the fifth count of his underlying indictment, which charges him with knowingly receiving "approximately 26 ounces of Composition B high explosive, contained within four grenades."

- 6 -

The district court consulted several dictionaries and concluded that "the ordinary meaning of 'grenade' implies a device that contains not only explosive material but also a means of detonating that explosive material." Id. at *5. The district court next reasoned that "explosive," when modifying "grenade," necessarily implied that the grenade "must, in fact, be capable of exploding." Id. Combining these understandings, the district court found that "the ordinary meaning of the phrase 'explosive grenade' . . . is a device that is in and of itself capable of exploding." Id. The district court then dismissed the counts. Id. at *8.

## II.

We clear away a preliminary procedural issue. Although we have not before addressed the issue, other "circuit courts have almost uniformly concluded" that, under Federal Rule of Criminal Procedure 12(b)(1), "a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts." United States v. Weaver, 659 F.3d 353, 355 n* (4th Cir. 2011) (collecting cases). We join this consensus.

The facts necessary to resolve the issue now on appeal are not in dispute, and the government had requested that the district court resolve the issue. We review the district court's

- 7 -

conclusion de novo, id. at 356, and determine that the court erred and so reverse.

## III.

As framed, on admitted facts, the question before us is an issue of law.  The government bears the burden of establishing that the grenades here met the definition of "explosive grenades." Musso, in turn, bears the burden as to whether the grenades fall within the exclusionary clause.  On the facts presented, we reject Musso's definitional argument as well as his argument, based on the exclusionary clause, that the FBI's removal of the grenades' fuzes means the grenades are not "designed" as weapons.  In addressing his argument based on the exclusionary clause, we treat Musso as having raised that affirmative defense and bypass any potential forfeiture resulting from his failure to pursue that argument in his motion to dismiss.

We begin, as always, with the statutory text concerning "explosive grenades."  The NFA definitional section requires that to be a "destructive device," a grenade must be an "explosive, incendiary, or poison gas . . . grenade."  26 U.S.C. § 5845(f). And an NFA "destructive device" must have been "designed [or] redesigned for use as a weapon," and not, if originally designed as a weapon, "redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device."  Id.  No issue is before us of the interpretation of other parts of the statute concerned with

- 8 -

other destructive devices or with the clause in Section 5845(f)(3) concerning "any combination of parts . . . from which a destructive device may be readily assembled."[2]

We dispose of Musso's argument based on the statutory exclusion first. On these facts, we reject the argument that because the grenades' fuzes were inoperable, that meant the grenades were "redesigned" so as not to be weapons. Congress only excluded certain "redesigned" devices: those that have been "redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device." 26 U.S.C. § 5845(f). There is no contention here that Musso's devices were redesigned for any of those purposes.

Musso's grenades were designed as weapons. Each M67 grenade sold to Musso was a standard-issue Marine Corps weapon. That the grenades were inoperable when purchased by Musso does not change the fact that they were "designed" as weapons. Cf. United States v. Rivera, 415 F.3d 284, 286 (2d Cir. 2005) ("Where a weapon designed to fire a projectile is rendered inoperable, whether on purpose or by accident, . . . it continues to be 'designed' to fire a projectile."). We conclude that Musso's explosive grenades were each "designed . . . for use as a weapon," 26 U.S.C. § 5845(f), and so were not excluded from the NFA's coverage.

---

[2] Cases construing that clause, like United States v. Posnjak, 457 F.2d 1110 (2d Cir. 1972), are not relevant here.

We turn to the definitional arguments. Congress did not, in the NFA, define the term "explosive grenade." When Congress uses words that it does not define, "we assume those words 'carry their plain and ordinary meaning.'" United States v. Gordon, 875 F.3d 26, 33 (1st Cir. 2017) (quoting Stornawaye Fin. Corp. v. Hill (In re Hill), 562 F.3d 29, 32 (1st Cir. 2009)). The district court reasoned "that the ordinary meaning of the phrase 'explosive grenade' in [Section] 5845(f) is a device that is in and of itself capable of exploding," Musso, 2018 WL 1313977, at *5, and "that a destructive device must contain certain essential components" -- namely, a working fuze, id. at *6.

The government challenges the district court's plain-text reading here. We find that the plain meaning of the words "explosive" and "grenade" do not clearly exclude the devices Musso purchased -- M67 grenades with inoperable fuzes. We then assume arguendo that the plain meaning of those words does not resolve this case in the government's favor and so we turn to other traditional tools of statutory interpretation. See Yates v. United States, 135 S. Ct. 1074, 1081 (2015) (noting that the meaning of a statutory term "does not turn solely on dictionary definitions of [that term's] component words"). We ultimately reject the district court's glosses on the term "explosive grenade" because they do not come from the NFA's text, "and we may not engraft our own exceptions onto the statutory text." Henry Schein, Inc. v.

_Archer & White Sales, Inc._, No. 17-1272, 2019 WL 122164, at \*5 (U.S. Jan. 8, 2019). We conclude, looking to statutory context, that Congress intended that the term "explosive grenade" include the grenades as purchased by Musso.

Where Congress wanted to define a device by its capability, it said so explicitly. Under Section 5845(f)(2), a weapon with a "bore of more than one-half inch in diameter" is a destructive device if it "will, or . . . may be readily converted to, <u>expel a projectile by the action of an explosive or other propellant</u>." 26 U.S.C. § 5845(f)(2) (emphasis added). This is a "test of objective capability," <u>United States</u> v. <u>Crooker</u>, 608 F.3d 94, 98 & n.2 (1st Cir. 2010), and it is not unique to Section 5845(f)(2). For instance, Section 5845(b) defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to <u>shoot, automatically more than one shot, without manual reloading, by a single function of the trigger</u>." 26 U.S.C. § 5845(b) (emphasis added). From the presence of capability requirements throughout Section 5845, and particularly in Section 5845(f)(2), we conclude that the absence of such a requirement in Section 5845(f)(1), the "explosive grenade" provision, is intentional. <u>See</u> <u>New Prime Inc.</u> v. <u>Oliveira</u>, No. 17-340, 2019 WL 189342, at \*7 (U.S. Jan. 15, 2019) (drawing a negative inference from word choices made in "a neighboring term in the statutory text").

Next, the language of Section 5845(f) does not require that an "explosive grenade" have specific parts, like a working fuze. Context immediately reinforces this conclusion: Under Section 5845(f)(1)(c), which directly follows the "explosive grenade" provision, a rocket only qualifies as a destructive device if it has "a propellent [sic] charge of more than four ounces." 26 U.S.C. § 5845(f)(1)(C). And right after that, Congress required that a missile have "an explosive or incendiary charge of more than one-quarter ounce." Id. § 5845(f)(1)(D). Section 5845 is filled with similar requirements: A shotgun must have "a barrel or barrels of less than 18 inches in length." Id. § 5845(a)(1). And a rifle must have "a barrel or barrels of less than 16 inches in length." Id. § 5845(a)(3). Congress could easily have required that an "explosive grenade" have a working fuze. We conclude that the absence of any such requirement was intentional.

We also consider the "destructive device" provision in the sequence in which Congress wrote Section 5845(f). See New Prime, 2019 WL 189342, at *4 (analyzing a statute based on its "terms and sequencing"). Section 5845(f)(1) first covers a bomb, grenade, rocket, missile, mine, or "similar device." 26 U.S.C. § 5845(f)(1). Section 5845(f)(2) then covers a weapon, "by whatever name known," that meets the capability test outlined above. Id. § 5845(f)(2). And finally, Section 5845(f)(3) covers "any combination of parts" that can be "readily assembled" into

- 12 -

one of the devices described in the previous two sections.  This sequence highlights that Section 5845(f)(1) was meant to cover weapons with evident, descriptive names, while 5845(f)(2) and (f)(3) are more in the nature of catch-all provisions meant to ensure coverage where intended beyond the named devices in 5845(f)(1).  Because "explosive grenade" is sufficiently descriptive to limit that provision's coverage, Congress did not add a capability requirement or a parts requirement.

Were there any doubt left, we would also note that Sections 5845(f)(2) and (f)(3) include language like "readily assembled" or "readily converted."  The functional cast of that language fits in those later catch-all provisions, which deal with all manner of weapons that have no evident name.  But for Section 5845(f)(1), no such modifying language was necessary.

The district court's contrary view has further problems: It reads the term "explosive" outside of its direct context.  Our interpretation avoids this problem.  Looking again to neighboring terms, we conclude that "explosive" describes a category of grenade.  Section 5845(f)(1) prohibits the unregistered receipt or possession of not only an "explosive . . . grenade," but also an "incendiary . . . grenade" or a "poison gas . . . grenade."  26 U.S.C. § 5845(f)(1)(B).  The natural reading is that "explosive" distinguishes one category of grenade covered by the statute from other categories of grenades, either within the statute (like

- 13 -

poison gas grenades) or outside the statute's reach (like, perhaps, smoke grenades). Cf. United States v. Williams, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated."). On the facts presented here, the district court's reading of the term "explosive" violates the "fundamental principle of statutory construction . . . that the meaning of a word cannot be determined in isolation." Yates, 135 S. Ct. at 1082 (quoting Deal v. United States, 508 U.S. 129, 132 (1993)).

The reasoning we have provided suffices to support our conclusion that Musso's devices were "explosive grenades," as Congress intended that term to be understood.[3]

The district court attempted to support its interpretation of "explosive grenade" by pointing to out-of-circuit precedent. But none of the cases the court cited were decided under Section 5845(f)(1)(b), the provision at issue here, and none involved grenades armed with their original explosive charges. In United States v. Malone, 546 F.2d 1182 (5th Cir. 1977), the defendant did not have, either in his possession or in

---

[3] Musso argues that we should apply the rule of lenity. But this rule "applies only if, 'after considering text, structure, history and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended.'" Abramski v. United States, 573 U.S. 169, 188 n.10 (2014) (quoting Maracich v. Spears, 570 U.S. 48, 76 (2013)). There is no grievous uncertainty here, so lenity does not apply.

the devices at issue, any explosive material.  Id. at 1184.  In United States v. Blackburn, 940 F.2d 107 (4th Cir. 1991), a sentencing appeal following a guilty plea, there were twenty-eight inert grenade hulls that contained no explosive material.  Id. at 109.  There was no proof there that the explosive charge within two live grenades could have been redistributed to make all thirty grenades there active, and the quantity of destructive devices was a factor in a sentencing enhancement.  Id. at 110.  And in United States v. Osuna, 189 F.3d 1289 (10th Cir. 1999), the Tenth Circuit merely accepted the government's concession that "inert" grenades did not qualify as destructive devices (without defining "inert") and so did not support a sentencing enhancement.  Id. at 1295. These cases say nothing about whether Musso's grenades fall under the statute.

Further, United States v. Sheehan, 838 F.3d 109 (2d Cir. 2016), supports our reasoning.[4]  The Second Circuit there held that a nonfunctioning homemade bomb that contained an explosive charge but had an inoperable fuze was an "explosive bomb" because it

---

[4]    We acknowledge that Sheehan involved the "destructive device" provision at 18 U.S.C. § 921(a)(4), enacted by the Omnibus Crime Control and Safe Streets Act of 1968.  But Congress, when it added the "destructive device" provision here to the NFA, copied that earlier provision verbatim.  And when a term "is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it."  Stokeling v. United States, No. 17-5554, 2019 WL 189343, at *5 (U.S. Jan. 15, 2019) (quoting Hall v. Hall, 138 S. Ct. 1118, 1128 (2018)).

- 15 -

remained capable of detonating by other means. Id. at 119-20. That the device "could not explode in the way its maker might have assumed was the ordinary or even only way in which it could be detonated -- i.e., via the fuzing system -- because it lacked a particular component of which such a device is ordinarily composed" was "irrelevant" there. Id. So too here.[5]

IV.

With the NFA, Congress aimed to decrease threats to public safety from destructive devices. These devices have been used for criminal conduct that has included robbery, S. Rep. No. 90-1097, at 78 (1968) (describing the use of a "Finnish Lahti antitank gun . . . in the robbery of a Brinks Co. installation"), and the "attempted assassination of a United States Attorney," United States v. Hamrick, 43 F.3d 877, 886 (4th Cir. 1995). And while we have no need to resort to legislative history, there is congressional history "to the effect that Congress intended to proscribe the activities generally associated with armed groups devoted to disruption of public authority." Posnjak, 457 F.2d at

---

[5] We do not rely on United States v. Rushcamp, 526 F.3d 1380 (6th Cir. 1975), which the government cites. There, the Sixth Circuit concluded that an inoperable military munition -- a rocket launcher with a broken firing mechanism -- was a destructive device. But that case turned on the language of Section (f)(2), which defines a rocket launcher as a destructive device if it "may be readily converted to, expel a projectile by action of an explosive or other propellant," id. at 1382, and not the Section at issue here.

1120.  But the district court's order would require agents conducting an undercover sting operation to give fully functional "weapons of war," id. at 1116, like explosive grenades, to potential felons.

The result reached by the district court is contrary to the complete text and context of the NFA and is not what Congress intended.  We reverse the dismissal of the counts against Musso, reinstate them, and remand for further proceedings consistent with this opinion.