# United States Court of Appeals
## For the First Circuit

No. 18-1254

UNITED STATES OF AMERICA,

Appellant,

v.

KENNETH BRISSETTE; TIMOTHY SULLIVAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Leo T. Sorokin, U.S. District Judge]

Before
Torruella, Kayatta, and Barron,
Circuit Judges.

Randall E. Kromm, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, were on brief, for appellant.

Sara E. Silva, with whom William H. Kettlewell and Hogan Lovells US LLP were on brief, for appellee Kenneth Brissette.

Thomas R. Kiley, with whom William J. Cintolo, Meredith G. Fierro, and Cosgrove Eisenberg & Kiley were on brief, for appellee Timothy Sullivan.

Paul F. Kelly, Donald J. Siegel, Jasper Groner, Segal Roitman LLP, Michael T. Anderson, and Murphy Anderson PLLC on brief for Members of Congress representing Greater Boston, amici curiae.

March 28, 2019

**BARRON**, **Circuit Judge**.   In 2015, two officials of the City of Boston, Massachusetts (the "City") allegedly threatened to withhold permits from a production company that needed them to put on a music festival, unless the company agreed to hire additional workers from a specific union to work at the event.   The officials were indicted for Hobbs Act extortion and conspiracy to commit Hobbs Act extortion two years later in the United States District Court for the District of Massachusetts.   The defendants sought to dismiss the indictment for failing to satisfy the "obtaining of property" element of Hobbs Act extortion.   18 U.S.C. § 1951(b)(2). The District Court granted that motion, and the government appeals from the order of dismissal.   We vacate and remand.

## I.

The Hobbs Act prohibits interference with interstate commerce through "robbery or extortion."  Id. § 1951(a).   The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  Id. § 1951(b)(2).   The "induced by wrongful use of actual or threatened force, violence, or fear" prong of the offense delineates a distinct form of extortion from the "under color of official right" prong.  See Evans v. United States, 504 U.S. 255, 263-64, 264 n.13 (1992).

- 2 -

The indictment sets forth charges against Kenneth Brissette and Timothy Sullivan, each of whom were employees of the City at all relevant times. The indictment charges each of them with Hobbs Act extortion and conspiracy to commit Hobbs Act extortion in violation of 18 U.S.C. §§ 1951 and 2. The indictment charges Brissette and Sullivan, however, only under the "induced by wrongful use of . . . fear" prong of Hobbs Act extortion -- specifically, with the "wrongful use of fear of economic harm." See 18 U.S.C. § 1951(b)(2).

A grand jury handed up the initial indictment on May 27, 2016. That indictment charged Brissette alone with only Hobbs Act extortion. The grand jury then handed up a superseding indictment on June 28, 2016. The superseding indictment added a charge of Hobbs Act extortion against Sullivan and also charged both men with conspiracy to commit Hobbs Act extortion.

The operative indictment is a third superseding indictment. It alleges the following facts, which we accept as true for purposes of our review. See United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015).

Brissette and Sullivan were both employed by the City at the time of the alleged offenses. Brissette was the Director of the City's Office of Tourism, Sports, and Entertainment. That office, among other responsibilities, helps entities that wish to host events in Boston secure permits to use public areas as the

- 3 -

venues.  Pursuant to his official powers, Brissette had the ability to issue and hold such permits.  Sullivan was the Mayor's Chief of Staff for Intergovernmental Relations and the Senior Advisor for External Relations.  The Mayor at the time was Martin Walsh.

Crash Line is a production company that had a licensing agreement with the City to put on biannual music festivals on Boston City Hall Plaza.[1]  The licensing agreement required Crash Line to obtain permits from the City to stage each festival.

Between July and September 2014, Crash Line sought certain permits and approvals from the City to put on one such festival in September 2014 as well as an extension of its licensing agreement.  While Crash Line was awaiting the permits and the licensing agreement extension, Brissette and Sullivan repeatedly told Crash Line that it would have to hire members of the International Alliance of Theatrical Stage Employees Local 11 Union ("Local 11") to work at the upcoming music festival.[2]  Crash Line repeatedly stated that its labor needs for that music festival were already satisfied by a pre-existing contract with a non-union company.  The licensing agreement between Crash Line and the City

_____

[1] The indictment refers to Crash Line as "Company A."

[2] In 2013, Local 11 had attempted to obtain work for its members from Crash Line to work at an upcoming festival.  Crash Line was not a signatory to any collective bargaining agreement with Local 11.  Crash Line repeatedly told Local 11 that its labor needs for that upcoming music festival were satisfied by a contract that it had already entered with a non-union company.

did not obligate Crash Line to hire the workers that it needed to put on a festival from any union or otherwise place restraints on Crash Line's hiring practices.

On September 2, 2014, Brissette and Sullivan met with Crash Line and again insisted that Crash Line hire members of Local 11 to work at the upcoming music festival. Brissette and Sullivan insisted that half of Crash Line's labor at the festival consist of union members. That same afternoon, Crash Line "entered into a contract with Local 11 to hire eight additional laborers and one foreman as a result of the demands made by Brissette and Sullivan." Shortly thereafter, the City issued Crash Line the permits that it needed to put on the festival.[3]

The first superseding indictment alleged that Brissette and Sullivan had "attempted to and did obtain" from Crash Line

---

[3] The indictment also alleges facts relating to two separate incidents in the summer of 2014 in which Brissette and Sullivan allegedly threatened to refuse to issue permits to two other production companies -- a production company filming the reality TV series Top Chef in Boston (referred to in the indictment as "Company B") and a production company filming a promotion for that show (referred to in the indictment as "Company C") -- unless they agreed to "make a deal" with Local 25 of the International Brotherhood of Teamsters. But, the indictment does not allege these incidents as separate counts of Hobbs Act extortion or conspiracy to commit Hobbs Act extortion. Instead, the government represented that it intends to offer evidence of these incidents only as proof of the defendants' intent, which is not at issue in this appeal. Accordingly, we do not need to address whether the facts alleged in the indictment relating to these incidents sufficiently allege an "obtaining of property" under the Hobbs Act extortion provision.

"money to be paid as wages for imposed, unwanted, and unnecessary and superfluous services and wages and benefits to be paid pursuant to a labor contract with Local 11." That indictment further alleged that Brissette and Sullivan had done so "with the consent of [Crash Line] . . . , which consent was induced by the wrongful use of fear of economic harm to [Crash Line] and others." The indictment also alleged that Brissette and Sullivan had conspired, "together with others, known and unknown to the Grand Jury," to commit the alleged extortion.

In January 2017, Brissette and Sullivan moved to dismiss that indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3). They contended that the indictment failed to allege "that the defendants themselves obtained or sought to obtain th[e] wages" alleged to be the extorted property. The District Court denied the motions.

In September 2017, we issued our decision in United States v. Burhoe, 871 F.3d 1 (1st Cir. 2017), which concerned the scope of Hobbs Act extortion. The defendants thereafter filed renewed motions to dismiss the first superseding indictment under Federal Rule of Criminal Procedure 12(b)(3). They argued that, in light of Burhoe, the indictment did not adequately allege the required elements of "wrongful[ness]" and "obtaining of property."

The government opposed the defendants' motions and, on November 29, 2017, obtained a second superseding indictment. That

indictment modified the description of the "property" that the defendants had allegedly "obtain[ed]" from Crash Line to "money to be paid as wages and employee benefits and as wages and employee benefits pursuant to a contract with IATSE Local 11."  Then, on January 31, 2018, the government obtained a third superseding indictment -- the operative one -- that made only non-substantive changes to the charging language.

On February 28, 2018, the District Court again refused to dismiss the indictment, because the defendants' motions to do so were based upon facts beyond the indictment.  Nevertheless, in light of the parties' disagreement over the meaning of "obtaining of property" in the Hobbs Act extortion provision, the District Court offered the following proposed instruction as to that element:

> To prove ["obtaining of property" under the Hobbs Act extortion provision], the government must prove beyond a reasonable doubt that Crash Line was deprived of its property, and that the defendants acquired that property.  A defendant "obtains" property for these purposes when he either: 1) takes physical possession of some or all of the property; 2) personally acquires the power to exercise, transfer, or sell the property; or 3) directs the victim to transfer the property to an identified third party and personally benefits from the transfer of the property.  It is not enough for the government to prove that the defendants controlled the property by directing its transfer to a third party, nor is merely depriving another of property sufficient to show that the defendants 'obtained' that property.

As to the third theory of "obtaining," the District Court also proposed to instruct the jury that:

> Under the third theory of "obtaining," you must determine, based on all of the evidence before you, whether the defendants personally benefitted from the transfer of the property. Instances in which a defendant personally benefits from the transfer of property could include: when the defendant or an organization of which he is a member receives a thing of value other than the property as a result of the transfer; when the defendant directs the property to a family member or to an organization of which the defendant is a member; and/or when the defendant directs the property to a person or entity to whom the defendant owes a debt, intending that the transfer of property will satisfy that debt. A defendant does not personally benefit from the transfer of property when he merely hopes to receive some future benefit, or when he receives a speculative, unidentifiable, or purely psychological benefit from it.

The District Court presented its proposed instructions as governing only the "obtaining" element. The District Court did not purport in the proposed instructions to address any of the other elements of Hobbs Act extortion.

The government filed an emergency motion for reconsideration of the District Court's proposed jury instructions. The government challenged only the "personal benefit" requirement that the District Court's proposed instructions had imposed for the third theory of "obtaining." The government indicated that its evidence would be insufficient to meet that element if the District Court did not change the proposed instructions. The defendants opposed the government's motion.

They argued that the District Court's proposed instructions correctly stated the law governing the "obtaining" element.

The District Court declined to reconsider its legal analysis but asked the government to proffer "the admissible evidence of [personal] benefit it possesses." The government made such a proffer[4] and filed a motion under Federal Rule of Criminal

---

[4] The government proffered the following evidence "regarding whether the defendants obtained a personal benefit in connection with their efforts to force Crash Line to transfer wages and benefits to Local 11 workers":

- Mayor Walsh enjoyed the support of multiple unions during his campaign for mayor, and some members of the administration assumed that unions would be among his preferred constituents.
- Local 11 Business Agent Colleen Glynn reported to her union members in an email on September 3, 2014 that they secured one crew chief and eight deck hands for the September 2014 Boston Calling Concert, and that "I want you all to know we got a ton of help from City Hall. Starting with the top, Mayor Walsh and his staff members Tim Sullivan & Joe Rull . . . these folks fought hard for us because Local #11 fought hard for them . . . and we MUST keep supporting them & the political candidates who will keep fighting on the side of labor. When there is a call to action event Local #11 must send help."
- The defendants wanted to avoid any embarrassment that a Local 11 picket and the use of a giant inflatable rat on City Hall Plaza might cause to a defendant and the Walsh administration, especially in light of the June 2014 actions of Teamsters Local 25 members in connection with the filming of Top Chef in Boston and Milton, which actions had garnered press attention and criticism in August 2014.

On appeal, the government does not dispute the District Court's conclusion that the evidence that it proffered did not suffice to show a personal benefit under the District Court's proposed

- 9 -

Procedure 12(b)(1) "request[ing] that the Court now decide the legal issue of whether 'obtaining' has been shown." Simultaneously, the defendants filed renewed motions under Federal Rule of Criminal Procedure 12(b)(3), unopposed by the government, for dismissal of the indictment.

On March 22, 2018, the District Court, resolving both the Rule 12(b)(1) and 12(b)(3) motions, dismissed the indictment. The District Court rejected the government's "primary position that no showing of benefit whatsoever is required to prove extortion (even where the property is acquired by a third party, rather than the defendants)." The District Court concluded that the government's proffered evidence and the facts alleged in the indictment were insufficient to show -- as it interpreted "obtaining of property" in the Hobbs Act extortion provision to require -- that the defendants received a personal benefit from the transfer of wages and benefits to the Local 11 workers that the defendants allegedly directed Crash Line to make. The government then appealed.

**II.**

Under Federal Rule of Criminal Procedure 12(b)(3), a defendant must "raise[] by pretrial motion" any "defect in the

_____

instructions. The government's position is -- as it was below -- that no such showing of personal benefit is required to show an "obtaining of property" under the Hobbs Act extortion provision.

- 10 -

indictment or information, including . . . failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  Ordinarily, with respect to such a motion, "the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense."  United States v. Savarese, 686 F.3d 1, 7 (1st Cir. 2012); see also United States v. Stewart, 744 F.3d 17, 21 (1st Cir. 2014) ("At the indictment stage, the government need not 'show,' but merely must allege, the required elements [of the offenses charged].").

In limited circumstances, however, "under Federal Rule of Criminal Procedure 12(b)(1), 'a district court may consider a pretrial motion to dismiss an indictment where the government does not dispute the ability of the court to reach the motion and proffers, stipulates, or otherwise does not dispute the pertinent facts.'"  United States v. Musso, 914 F.3d 26, 29-30 (1st Cir. 2019) (quoting United States v. Weaver, 659 F.3d 353, 355 n* (4th Cir. 2011)).  "Under this scenario, a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt."  United States v. Hall, 20 F.3d 1084, 1088 (10th Cir. 1994) (emphasis in original).

Based on the government's motion under Federal Rule of Criminal Procedure 12(b)(1) for the District Court to "decide the

- 11 -

legal issue of whether 'obtaining' has been shown" and the defendants' simultaneous renewed motions, unopposed by the government, for dismissal of the indictment under Federal Rule of Criminal Procedure 12(b)(3), the District Court dismissed the indictment. The District Court did so based on its determination that the facts alleged in the indictment and the government's proffered evidence "regarding whether the defendants obtained a personal benefit" were insufficient to "prove [that] the defendants obtained the property at issue as required" under the Hobbs Act extortion provision.

We have jurisdiction under 18 U.S.C. § 3731 to review any "decision, judgment, or order of a district court dismissing an indictment." Id.; see also Weaver, 659 F.3d at 355 n.*. "Because the district court's ruling was a legal determination based on its interpretation of [18 U.S.C. § 1951(b)(2)] and relevant case law," Hall, 20 F.3d at 1088, we proceed to "review[ing] the [D]istrict [C]ourt's conclusion de novo," Musso, 914 F.3d at 30.

### III.

The primary issue on appeal is a limited one. We must decide whether the defendants' "merely directing property to a third party" constitutes their "obtaining of [that] property" under the Hobbs Act extortion provision -- as the government contends -- or whether -- as the District Court ruled and the defendants assert -- the defendants must also "enjoy[] a personal

- 12 -

benefit from" that directed transfer in order for the "obtaining" element to be satisfied. Because "[a]s framed, on admitted facts, th[is] question . . . is [only] an issue of law," our review is de novo. Musso, 914 F.3d at 30.

**A.**

"We begin where all such inquiries must begin: with the language of the statute itself." Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 412 (2012). The Hobbs Act extortion provision does not refer to the defendant's "obtaining" of anything other than "property from another." 18 U.S.C. § 1951(b)(2). The "obtaining of property" element does not on its face, therefore, require the government to prove that the defendant received a personal benefit, at least insofar as the government otherwise may show that the defendant "obtain[ed]" what the statute refers to as "property."

The defendants nevertheless contend that the text -- apparently through the use of the word "obtaining" itself -- impliedly imposes that "personal benefit" requirement in a circumstance in which the defendant is charged only with having "induce[d]" the victim's "consent" to transfer "property" to an identified third party. Id. But, when we focus on the possible meaning of the word "obtaining," we see no reason to import such a "personal benefit" requirement into the text.

- 13 -

The Hobbs Act does not define either the word "obtaining" or the broader phrase, "obtaining of property," in which it appears.  See id.  We thus follow the interpretive approach that the United States Supreme Court used in Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393 (2003), in an attempt to discern the meaning of "obtaining."  There, the Court was similarly confronted with a contention that the "obtaining of property" element in the Hobbs Act extortion provision did not encompass the conduct for which the defendants had been charged.  See id. at 404.  The Court proceeded by looking to the common-law crime of extortion, which in turn led the Court to consider how the Model Penal Code ("MPC") defined extortion and its "obtaining of property" element.  See id. at 408 & n.13 (quoting Model Penal Code § 223.3, cmt. 2, at 182).

The MPC definition of extortion, as it turns out, expressly defines "obtaining" -- as the Court noted in Scheidler.  See id.  The MPC does so by defining "obtaining" -- again, as Scheidler notes -- as "bring[ing] about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another."  Id. (emphasis added) (alterations in original) (quoting Model Penal Code § 223.3, cmt. 2, at 182).  The MPC definition of "obtaining" quoted by Scheidler expressly provides that it encompasses conduct in which a defendant brings about a transfer of property to a third party rather than to

- 14 -

himself. See id. (quoting Model Penal Code § 223.3, cmt. 2, at 182). That definition does so, moreover, without purporting to require in such a circumstance that the defendant who brings about that transfer to a third party receive a personal benefit in consequence. In other words, the word "obtaining," as used in the MPC definition of extortion, does not impliedly contain the personal benefit requirement that the defendants contend is impliedly contained in the word "obtaining" in the Hobbs Act extortion provision.

We recognize that Scheidler was not concerned with determining whether or when a transfer of property to a third party, effected at the defendant's direction, could satisfy the "obtaining of property" element. But, the fact that the text of the MPC definition of extortion to which the Court looked in construing the "obtaining of property" element of Hobbs Act extortion imposes no "personal benefit" requirement in such a scenario strongly counsels against the defendants' position that such a requirement must be lurking in the Hobbs Act. Nothing in Scheidler -- nor in any other precedent -- suggests that Congress intended the Hobbs Act to codify a form of extortion different, with respect to the "obtaining of property" element, from the common-law form of extortion defined by the MPC. See id. at 402-03 ("While the Hobbs Act expanded the scope of common-law extortion

to include private individuals, the statutory language retained the [common-law] requirement that property must be 'obtained.'").

The surrounding context of the word "obtaining" in the Hobbs Act's extortion provision reinforces this conclusion. See Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). The text provides that it is "property" and not a benefit that the defendant must "obtain[] . . . from another." 18 U.S.C. § 1951(b)(2). Whether a defendant receives a "personal benefit" thus would not appear to provide a means of distinguishing between transfers of property to third parties directed by the defendant that would satisfy the "obtaining of property" element and those that would not.

**B.**

When we turn to Hobbs Act extortion precedents that directly address the application of the statute's "obtaining of property" element to circumstances in which the defendant is alleged to have directed the transfer of property to a third party, we find further reason to doubt that the element requires proof that the defendant received a "personal benefit" from such a

- 16 -

transfer.  We start with United States v. Green, 350 U.S. 415 (1956).

There, a union and its representative were charged with extorting from employers "wages to be paid for imposed, unwanted, superfluous and fictitious services" of members of the union other than themselves.  Id. at 417.  In rejecting the view that "the Hobbs Act covers only the taking of property from another for the extortioner's personal advantage," Green concluded that "extortion as defined in the [Hobbs Act] in no way depends upon having a direct benefit conferred on the person who obtains the property." Id. at 418, 420 (emphasis added).

The defendants are right that the transfer of property that the defendants induced in Green was to members of a union to which the defendants belonged.  They are also right that the defendants here were not members or agents of the union from which Crash Line was allegedly forced to hire "additional" workers for the music festival.  But, the Court did not indicate in Green that it intended to limit its categorical statement rejecting a "direct benefit" requirement to the particular circumstance in which the defendant is also a member of the union whose members he forces the extortion victim to hire.  Id. at 420.[5]

_____

[5] We note that the extortion at issue in Green was carried out "through threats of force or violence," Green, 350 U.S. at 420, rather than through the "wrongful use of . . . [economic]

- 17 -

Nor does the Supreme Court's more recent decision concerning the "obtaining of property" element in Sekhar v. United States, 570 U.S. 729 (2013), demonstrate, as the defendants suggest that it does, that the element cannot encompass a directed transfer of property to a third party in the absence of the defendant thereby receiving a personal benefit. Sekhar did hold, as the defendants note, that the Hobbs Act extortion provision's "obtaining of property" element requires proof of "the acquisition of property" -- "[t]hat is," proof that "the victim part[ed] with his property, and that the extortionist gain[ed] possession of it." Id. at 735 (internal quotation marks and citations omitted). But, we do not see how that part of Sekhar precludes the conclusion that a defendant may "acqui[re]" property within the meaning of Sekhar by directing its transfer from the victim to a party of his choosing, notwithstanding that he does not otherwise personally benefit from the transfer.

Sekhar contains no suggestion that it reads the Hobbs Act to codify a form of extortion that, with respect to the "obtaining of property" element, is distinct from the one set forth

fear," 18 U.S.C. § 1951(b)(2). Thus, Green had no occasion to address whether -- in a case not involving "force or violence" -- its categorical statement disclaiming a "direct benefit" requirement might bear on the separate "wrongful[ness]" element of Hobbs Act extortion, notwithstanding that the forced payment of wages to "additional" third-party laborers without any "direct benefit" to the defendant otherwise satisfies the "obtaining of property" element.

- 18 -

in the version of the MPC quoted by <u>Scheidler</u>.  See <u>id.</u> (quoting <u>Scheidler</u>, 537 U.S. at 404, for the proposition that "obtaining property requires not only the deprivation but also the acquisition of property").  Thus, the fact that the MPC extortion provision quoted in <u>Scheidler</u> defines "obtaining" to encompass a defendant's "bring[ing] about a transfer of . . . property . . . to . . . <u>another</u>," <u>Scheidler</u>, 537 U.S. at 408 n.13 (emphasis added) (quoting Model Penal Code § 223.3, cmt. 2, at 182), suggests that no such personal benefit from a directed transfer of property to a third party is necessary to effectuate "the acquisition of property" that <u>Sekhar</u> requires, <u>see</u> <u>Sekhar</u>, 570 U.S. at 734.

In addition, the only circuits to have squarely addressed this question -- including one that has done so in the wake of <u>Sekhar</u> -- have each held that a defendant does acquire the property at issue, within the meaning of the "obtaining" element, by directing its transfer to another of his choosing, irrespective of whether he receives a personal benefit as a result.  <u>See</u> <u>United States</u> v. <u>Carlson</u>, 787 F.3d 939, 944 (8th Cir. 2015) (finding the "obtaining of property" element met where the defendant "did demand items of value, she just did not seek to obtain them for herself" (emphasis omitted)); <u>United States</u> v. <u>Vigil</u>, 523 F.3d 1258, 1264 (10th Cir. 2008) (holding that the "obtaining of property" element was met where a state treasurer "attempted to obtain money from [a

- 19 -

company's head] and direct that money to [a political supporter's wife]"); United States v. Gotti, 459 F.3d 296, 324 n.9 (2d Cir. 2006) (noting that a defendant may obtain property by "order[ing] the victim to transfer the [victim's property] rights to a third party of the extortionist's choosing" (emphasis added)); United States v. Panaro, 266 F.3d 939, 943 (9th Cir. 2001) (explaining that under the Hobbs Act, "someone -- either the extortioner or a third person -- must receive the property of which the victim is deprived" (emphasis added)); United States v. Provenzano, 334 F.2d 678, 686 (3d Cir. 1964) (noting that "[i]t is enough [under the Hobbs Act] that payments were made at the extortioner's direction to a person named by him" (emphasis added)).  This same conclusion accords with -- even though it is not compelled by -- our decision in Burhoe, insofar as it addressed the "obtaining of property" element.  See Burhoe, 871 F.3d at 27-28 (noting that a union leader taking work away from one union member and giving it to a different union member could potentially be an "obtaining of property").

## c.

The defendants do point to one last set of precedents that they contend supports their contention that -- at least where the defendant is alleged to have directed the victim's transfer of property to a third party -- the defendant must have received a personal benefit from the transfer in order to have "obtain[ed]" the property at issue.  These so-called "under color of official

right" Hobbs Act extortion cases require proof of "the sale of public favors for private gain," Wilkie v. Robbins, 551 U.S. 537, 564 (2007) (emphasis added), or proof of there being a quid pro quo, see, e.g., Evans, 504 U.S. at 267-68; McCormick v. United States, 500 U.S. 257, 273 (1991).

But, the Court did not hold in any of those cases that the "obtaining of property" element requires proof that the defendant received a personal benefit separate and apart from having "br[ought] about a transfer of . . . property to . . . another." Scheidler, 537 U.S. at 408 n.13 (emphasis added) (quoting Model Penal Code § 223.3, cmt. 2, at 182). The Court simply had no reason to address that distinct issue in any of those cases because the facts in each were such that the property alleged to be "obtain[ed]" was transferred from the victim directly to the defendant. See, e.g., Evans, 504 U.S. at 257 (public official received $7,000 from a real estate developer in exchange for voting in favor of the developer's rezoning application).

Moreover, the passages from these cases on which the defendants rely do not even concern the "obtaining of property" element of the Hobbs Act extortion provision that is our concern here. They concern the statute's "under color of official right" element, 18 U.S.C. § 1951(b)(2), which the indictment in this case does not implicate. See id. at 268 n.20 ("[T]he requirement that

the payment must be given in return for official acts . . . is derived from the statutory language 'under color of official right,' which has a well-recognized common-law heritage that distinguished between payments for private services and payments for public services." (emphasis added)); Wilkie, 551 U.S. at 565 (holding that "efforts of Government employees to get property for the exclusive benefit of the Government" do not qualify as extortion "under color of official right"). Thus, these precedents have no bearing on the issue before us, which concerns solely the meaning of the "obtaining of property" element.

### D.

In sum, we reject the contention that a defendant "obtain[s] . . . property" within the meaning of the Hobbs Act extortion provision by "bring[ing] about [its] transfer . . . to another," Scheidler, 537 U.S. at 408 n.13 (quoting Model Penal Code § 223.3, cmt. 2, at 182), only if the defendant receives a personal benefit in consequence. In doing so, we align ourselves with the only other circuits to have resolved that same question. See, e.g., Provenzano, 334 F.2d at 686 (holding that "it is not necessary to prove that the extortioner himself, directly or indirectly, received the fruits of his extortion or any benefit therefrom"); United States v. Hyde, 448 F.2d 815, 843 (5th Cir. 1971) ("One need receive no personal benefit to be guilty of extortion; the gravamen of the offense is loss to the victim."

(citing Provenzano, 334 F.2d at 686)); Panaro, 266 F.3d at 943 (quoting Provenzano, 334 F.2d at 686; Hyde, 448 F.2d at 843).

**IV.**

The defendants do separately press an alternative ground for affirming the indictment's dismissal, which appears not to depend on whether the "obtaining of property" element contains a personal benefit requirement. The defendants point out that Sekhar held that blackmailing the general counsel of a company into making a recommendation to approve a particular investment did not amount to an "obtaining of property" within the meaning of the Hobbs Act extortion provision. See Sekhar, 570 U.S. at 737-38. The defendants emphasize that the Court came to that conclusion after determining that the defendant's "goal" in that case "was not to acquire the general counsel's intangible property right to give disinterested legal advice[,] [but] was to force the general counsel to offer advice that accorded with [the defendant's] wishes." Id. at 738 (emphasis added) (internal quotation marks omitted). The defendants assert that their case is no different than Sekhar, as the indictment alleged no more than that they "force[d] [Crash Line] to [hire workers] that accorded with [their] wishes." Id. (emphasis added).

As the defendants put it, in light of Sekhar, the facts proffered and alleged in the indictment "fail[] to establish that Defendants 'directed' the wages and benefits to anyone, much less

- 23 -

to an 'identified third party,'" such that the defendants "obtain[ed]" them within the meaning of the Hobbs Act extortion provision. That is because, the defendants contend, the allegations establish, at most, only that the defendants procured "the opportunity for a set number of union members to perform real work at an upcoming event" and not that the defendants "sent over" property in the form of "wages and benefits" to those union members.

The District Court did not resolve this precise question, as it based its ruling solely on the conclusion that there was a personal benefit requirement where a defendant directs the victim to transfer the property to a third party. But, the District Court did dismiss the indictment on the ground that "the government cannot prove the defendants obtained the property at issue as required." We thus see no reason to leave this alternative ground for affirmance unaddressed. It undoubtedly relates to whether "the government can[] prove the defendants obtained the property at issue . . . ." The defendants have fully briefed it on appeal.[6] See Oxford Aviation, Inc. v. Glob.

---

[6] The defendants also seem to have made this argument below in defending its interpretation of the "obtaining of property" element. The defendants argued in the opposition to the government's motion for emergency reconsideration of the District Court's proposed jury instructions, for example, that "this case involves wages and benefits that were paid directly to union members that are not affiliated with the defendants [and] [t]he

Aerospace, Inc., 680 F.3d 85, 87–88 (1st Cir. 2012) ("[An appellee] is entitled to defend a judgment on any adequately preserved ground that supports that judgment even if the district judge ignored . . . that ground."). It also presents a question of law that would otherwise arise on remand.

In taking up this issue, we begin by looking to Sekhar itself. Sekhar did cite as an example of the common-law crime of coercion, which contains no "obtaining of property" element, People v. Scotti, 195 N.E. 162 (N.Y. 1934). There, the defendants were convicted of coercion under New York law for "compelling [the] victim to enter into [an] agreement with [a labor] union." Sekhar, 570 U.S. at 735. Sekhar concluded that this conduct -- along with "compelling [a] store owner to become a member of a trade association and to remove advertisements" from his storefronts, see People v. Ginsberg, 188 N.E. 62 (N.Y. 1933) (per curiam), and "compelling union members to drop lawsuits against union leadership," see People v. Kaplan, 240 A.D. 72, 74-75 (N.Y. App. Div.), aff'd, 191 N.E. 621 (N.Y. 1934) -- was the "sort of [mere]

wages and benefits were only paid after the union members earned them by performing actual services for Crash Line." And, the defendants' proposed jury instructions would have explained that "[i]t is not enough for the government to prove that the defendant controlled the money to be paid as wages and benefits and received an unidentifiable benefit from that control" and that "[m]erely interfering with or depriving another of property is not sufficient to show that the defendants obtained Crash Line's property."

- 25 -

interference with rights" that Congress chose to leave outside the scope of the Hobbs Act extortion provision by including the "obtaining of property" element. Sekhar, 570 U.S. at 735.[7]

The defendants do not dispute, though, that the Supreme Court's pre-Sekhar precedents make clear that Congress intended the Hobbs Act to extend to -- and thus necessarily for its "obtaining of property" element to be satisfied by -- the "use of . . . extortion under the guise of obtaining wages in the obstruction of interstate commerce." United States v. Enmons, 410 U.S. 396, 403 (1973) (emphasis added) (quoting 91 Cong. Rec. 11,900 (1945) (remarks of Rep. Hancock)); see also United States v. Kemble, 198 F.2d 889, 891 (3d Cir. 1952) ("[T]he conclusion seems inescapable that Congress intended that the language used in the [Hobbs Act] be broad enough to include, in proper cases, the forced payment of wages."). After all, the Supreme Court made it quite clear in Enmons that "the Hobbs Act has properly been held to reach instances where union officials threatened force or violence against an employer in order to . . . exact 'wage' payments from

---

[7] Sekhar also cited the case of King v. Burdett, 91 Eng. Rep. 996 (K.B. 1696), in which a farmer was convicted of the common-law crime of extortion for "taking money from the market people for rent for the use of the little stalls in the market." Id. at 966; see Sekhar, 570 U.S. at 733. Sekhar noted that Burdett found the conduct to be extortionate not because the defendant's conduct deprived the market people of "free liberty to sell their wares in the market according to law," but because it effectuated "the taking of money for the use of the stalls." Id. at 733 (quoting Burdett, 91 Eng. Rep. at 996).

employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers." Enmons, 410 U.S. at 400 & n.4 (emphasis added) (citing Green, 350 U.S. at 417; Kemble, 198 F.2d at 889). "[I]n those situations," the Court concluded, "the employer's property has been misappropriated." Id. at 400. Nor do the defendants contend that Sekhar -- silently -- superseded this established line of Hobbs Act extortion precedent. See Sekhar, 570 U.S. at 734 (quoting Scheidler, 537 U.S. at 404 (citing Enmons, 410 U.S. at 400)); see also Agnostini v. Felton, 521 U.S. 203, 237 (1997) (cautioning "other courts" against "conclud[ing] [that] more recent cases [of the Supreme Court] have, by implication, overruled an earlier precedent").

The defendants' only response to the Enmons line of precedent -- insofar as they contend that Sekhar independently compels us to affirm the dismissal of the indictment -- is that it has no application here. They argue that, for this line of precedent to apply, such that we could conclude that the allegations in the indictment satisfy the "obtaining of property" element even if we set aside the personal benefit requirement, "the government must allege and prove that the work [that Crash Line was forced to pay for] was 'fictitious' in addition to being 'imposed, unwanted and superfluous.'"

In fact, the defendants argue that our decision in Burhoe, 871 F.3d at 20, compels the conclusion that the wages at

- 27 -

issue must have been exacted for fictitious -- rather than actual -- work in order for the "obtaining of property" element to be satisfied.  Yet, the defendants contend, the facts proffered by the government and those alleged in the indictment show only that the "payments" at issue "were made directly to union members with no connection to the defendants after they earned the money by performing actual, bargained-for services at the concert."  Thus, the defendants contend, notwithstanding the Enmons line of precedent, there is no adequate allegation that the defendants "directed" the wages and benefits to an "identified third party," such that the defendants "obtain[ed]" them within the meaning of the Hobbs Act extortion provision.

But, insofar as Burhoe addressed the distinction between the exaction of wages for fictitious and for real work, it did so only in connection with deciding whether the defendants' alleged conduct was "wrongful" within the meaning of the Hobbs Act extortion provision, see 18 U.S.C. § 1951(b)(2), and then only in connection with the specific jury instructions that had been given in that case.  See Burhoe, 871 F.3d at 17, 19.  Burhoe did not purport to resolve the separate question, and the only one that we decide here, whether evidence of the forced payment of wages for actual -- rather than for merely fictitious -- work can satisfy the "obtaining of property" element.

- 28 -

Moreover, a review of the precedents that we considered in Burhoe, which concerned Hobbs Act extortion charges for the exaction of wages and benefits for union members, reveals the problem with the defendants' contention that the "obtaining" element requires proof that the wages were exacted for fictitious rather than real work. As we explained in Burhoe, the predecessor to the Hobbs Act -- the Anti-Racketeering Act of 1934 -- excepted from its reach "the payment of wages of a bona-fide employer to a bona-fide employee." Id. at 18 (quoting Act of June 18, 1934, ch. 569, § 2, 48 Stat. 979, 980). But -- as we noted in Burhoe, see id., and as the Court observed in Green, see 350 U.S. at 419 n.5, Enmons, see 410 U.S. at 402, and Scheidler, see 537 U.S. at 407 -- Congress, in enacting the Hobbs Act in 1946, deliberately removed the bona-fide employer-employee exception "so as to change the terms which brought about the result reached in [United States v. Local 807, Int'l Bhd. of Teamsters, 315 U.S. 521 (1942)]." Green, 350 U.S. at 419 n.5.

This history is instructive. As we noted in Burhoe and as the Court noted in Scheidler, Local 807 involved the violent exaction of wages both for actual services performed and for fictitious work. See Burhoe, 871 F.3d at 18 (citing Local 807, 315 U.S. at 526); Scheidler, 537 U.S. at 407 (noting that the money exacted by the "union truckdrivers" in Local 807 was "in return for undesired and often unutilized services" (emphasis added)

- 29 -

(citations and internal quotation marks omitted)).  The Court did not suggest in Local 807, however, that whether the defendants' conduct in exacting such wages qualified as an "obtain[ing] of . . . property" turned on whether or not the work was performed.  See Local 807, 315 U.S. at 534 ("We do not mean [to suggest] that an offer to work or even the actual performance of some services necessarily entitles one to immunity under the exception.").  The Hobbs Act's intent to "reverse the result in" Local 807, see Scheidler, 537 U.S. at 407, thus suggests that "the Hobbs Act was meant to stop just such conduct" as Local 807 concerned -- that is, "trying by force to get jobs and pay from [a non-union entity] by threats and violence," Green, 350 U.S. at 420 (emphasis added), even where "union members [] perform or seek actual work" for the exacted pay, Burhoe, 871 F.3d at 18 (emphasis added) (citing Local 807, 315 U.S. at 526).  And because the Hobbs Act could do so only if such conduct satisfied its "obtaining" element, we do not see how this line of precedent may be squared with the defendants' alternative argument for upholding the District Court's dismissal of the indictment.  See Scheidler, 537 U.S. at 404 (quoting Enmons, 410 U.S. at 400, for the proposition that "[e]xtortion under the Hobbs Act requires a '"wrongful" taking of . . . property'" (emphasis and alterations in original)).

The defendants are correct that "the indictment that the Court blessed [in Green] required that the work be 'fictitious' in

- 30 -

order for Hobbs Act liability to attach." Burhoe, 871 F.3d at 15 (citing Green, 350 U.S. at 417). But, as we noted in Burhoe, "the fact that Green rejected a challenge to a Hobbs Act indictment charging the defendants in that case with seeking fictitious work does not necessarily mean that a showing of fictitiousness is required to prove that union efforts to obtain work for its members constitutes extortion under the Hobbs Act." Id. at 16 (citing Green, 350 U.S. at 417).

Burhoe shows why that is so, moreover. It noted that the Enmons Court cited Kemble approvingly as "as a proper application of the Hobbs Act." See id. at 19 (citing Enmons, 410 U.S. at 400 & n.5, 409 (citing Kemble, 198 F.2d at 892)). In Kemble, the Third Circuit concluded that the Hobbs Act extortion provision -- and thus its "obtaining of property element" -- encompassed the conduct of a union agent who, "understanding that [a driver] did not want or need a helper and was not authorized to employ one, nevertheless forcibly insisted that [the driver] pay $10, described as a day's wages, for a supernumerary to do what [the driver] himself was paid to do and was accomplishing when [the union agent] intervened." Kemble, 198 F.2d at 890. Kemble held that such forced "payment of money for imposed, unwanted and superfluous services . . . by violent obstruction of commerce is within the language" of the Hobbs Act extortion provision, which, of course, includes the "obtaining of

property" element.[8]  Id. at 892.  Thus, Enmons, by virtue of its favorable citation to Kemble, further supports the conclusion that the "obtaining of property" element may be satisfied by a forced transfer of wages and benefits to a third party for actual rather than merely fictitious labor.

Sekhar was, of course, decided after Kemble, Enmons, and Scheidler.  But, Sekhar gives no indication that it meant to limit the reach of those decisions with respect to the "obtaining of property" element.  In fact, consistent with that conclusion, the Second Circuit recently rejected a defendant's "Sekhar-based challenge" by holding that the "obtaining of property" element was met where the president of a local union "used threats of violence and destruction of property in an attempt to force contractors to hire members of his union" to perform real rather than fictitious work.  United States v. Kirsch, 903 F.3d 213, 216, 225 (2d Cir. 2018), cert. denied, No. 18-892, 2019 WL 888142 (U.S. Feb. 25, 2019).  In doing so, the Second Circuit explained that the defendant "sought to extort property that Local 17 members could

---

[8] As we noted in Burhoe, with respect to wrongfulness, "the holding in Kemble is limited by the fact that the union's agent engaged in violent conduct that was nowhere sanctioned by federal or state law."  Burhoe, 871 F.3d at 19.  But, the clear import of Kemble is that such a situation is otherwise considered an "obtaining of property" under the Hobbs Act extortion provision.

clearly 'obtain': wages and benefits from construction contractors."[9]  Id. at 225, 227.

## V.

The government has charged two public officials on a novel theory of Hobbs Act extortion.  Given the stakes, the parties "requested a pretrial ruling on a dispositive legal question that the parties ha[d] substantially explored in briefs and oral argument [for] over [a] year."  In resolving that legal question on appeal, which concerns only the meaning of "obtaining of property," we express no view as to whether the indictment sufficiently alleges the other elements of Hobbs Act extortion or whether the government would ultimately be able to prove its case beyond a reasonable doubt were it to proceed to trial.  Thus, we express no view as to whether, for example, the defendants' conduct was "wrongful," as it must be under the statute, given that they are charged with the variant of Hobbs Act extortion that requires proof of the "wrongful use of . . . fear [of economic harm]" to

---

[9] The Second Circuit was interpreting the "obtaining of property" element in "[t]he 'generic' definition of extortion applicable to RICO state law extortion predicate acts," which it concluded was "nearly identical" to "the Hobbs Act definition of extortion" and was thus governed by the Supreme Court's decision concerning Hobbs Act extortion in Sekhar.  Id. at 225.

"induce[]" the victim's "consent" to the transfer of property at issue. See 18 U.S.C. § 1951(b)(2).

We are mindful, though, that the defendants are local officials who have been charged under a federal criminal statute for using their putative permitting authority to benefit others without personally receiving any gain. We are mindful, too, of the concerns expressed by the Supreme Court that an overly broad application of the Hobbs Act could unduly chill official conduct. See, e.g., McDonnell v. United States, 136 S. Ct. 2355, 2372 (2016); Wilkie, 551 U.S. at 567; McCormick, 500 U.S. at 272.

The defendants have been charged, moreover, with conduct that is, as a factual matter, quite distinct from other "wrongful use[s] of . . . fear," a quintessential example of which, the Supreme Court has explained, is "a store owner mak[ing] periodic protection payments to gang members out of fear that they will otherwise trash the store." Ocasio v. United States, 136 S. Ct. 1423, 1435 (2016). And, the defendants have been charged with threatening "fear of economic harm" -- a "type of fear," we have explained, that "is not necessarily 'wrongful' for Hobbs Act purposes." Burhoe, 871 F.3d at 9 (citations omitted). In fact, just as "fear of economic harm is part of many legitimate business transactions," fear of economic harm may also be a necessary consequence of many legitimate exercises of official authority.

Id. (citations omitted).[10]  In the end, whether "[t]he use of economic fear" is "wrongful" within the meaning of the Hobbs Act extortion provision turns, at least in part, on whether it was "employed to achieve a wrongful purpose."  Id. (internal quotation marks omitted).

Neither the District Court nor the parties on appeal have addressed the "wrongful[ness]" element.[11]  We also have not had previous occasion to address whether that element is met in circumstances resembling the conduct that is alleged in the indictment here, which concern the use of economic fear by government officials to secure real work for members of a specific union and for which the officials would receive no personal gain.  We thus confine our holding to the element of the offense that is the sole focus of the parties' arguments to us -- namely, the statute's "obtaining of property" element.  And we

---

[10] By contrast, "we have made clear that the use of actual or threatened violence or force is 'inherently wrongful,' as is the use of fear of physical harm."  Id. (quoting United States v. Sturm, 870 F.2d 769, 773 (1st Cir. 1989), and citing United States v. Kattar, 840 F.2d 118, 123 (1st Cir. 1988)).

[11] We note that, below, the defendants raised the issue of wrongfulness, as we interpreted that element in Burhoe, in their renewed motion to dismiss the indictment, and the government argued that the superseding indictment sufficiently alleged the element of wrongfulness.  The District Court denied that motion to dismiss as to the "wrongful[ness]" and "obtaining" elements as "turn[ing] on facts beyond the [third] superseding indictment which the Court cannot consider at this time."  That order, however, is not at issue in this appeal.

conclude -- contrary to the District Court -- that this element may be satisfied by evidence showing that the defendants induced the victim's consent to transfer property to third parties the defendants identified, even where the defendants do not incur any personal benefit from the transfer and even where the transfer takes the form of wages paid for real rather than fictitious work.

The District Court's order of dismissal is vacated, and the matter is remanded for further proceedings consistent with this opinion.